# United States Court of Appeals

## For the First Circuit

Nos. 18-1687
     19-1750

UNITED STATES OF AMERICA,

Appellee,

v.

NOE SALVADOR PÉREZ-VÁSQUEZ, a/k/a Crazy,

Defendant, Appellant.

Nos. 19-1027
     19-1745

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS SOLÍS-VÁSQUEZ, a/k/a Brujo,

Defendant, Appellant.

Nos. 18-1975
     19-1734

UNITED STATES OF AMERICA,

Appellee,

v.

HECTOR ENAMORADO, a/k/a Vida Loca,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

———————————

Before

Lynch, Lipez, and Barron,
Circuit Judges.

———————————

H. Manuel Hernández for appellant Noe Salvador Pérez-Vásquez, a/k/a Crazy.

Ian Gold for appellant Luis Solís-Vásquez, a/k/a Brujo.

Rosemary Curran Scapicchio for appellant Hector Enamorado, a/k/a Vida Loca.

Sonja Ralston, Appellate Section Attorney for the Department of Justice, with whom Andrew E. Lelling, United States Attorney, Donald C. Lockhart, Assistant United States Attorney, Brian C. Rabbitt, Acting Assistant Attorney General, and Robert A. Zink, Acting Deputy Assistant Attorney General, were on brief, for appellee.

———————————

July 26, 2021

———————————

**LYNCH**, **Circuit Judge**.  In 2016, the government indicted sixty-one alleged members of the MS-13 gang for participation in a Racketeer Influenced and Corrupt Organization Act ("RICO") conspiracy and other crimes.  The district court divided the sixty-one defendants into four trial groups.  This appeal concerns some of the defendants in group two.  The defendants in group three are the subject of our opinion in United States v. Sandoval, Nos. 18-1993, 18-2165, 18-2177, 19-1026, 2021 WL 2821070, at *2 (1st Cir. July 7, 2021).

Three defendants from group two proceeded to trial.  After a nineteen-day trial, a jury convicted each of the defendants of RICO conspiracy with a special finding that defendant Noe Salvador Pérez-Vásquez participated in the murder of Jose Aguilar Villanueva and special findings as to each that they had participated in the murder of Javier Ortiz.  The defendants allege a number of errors in both their trial and sentencings.  We carve out to be discussed in a later opinion defendant Luis Solís-Vásquez's challenge to the district court's restitution order.  Having determined that the remaining challenges do not have merit, we affirm.

## I. Facts

Because the defendants have challenged the sufficiency of the evidence, we recite the facts "in the light most favorable

to the jury's verdict." United States v. Leoner-Aguirre, 939 F.3d 310, 313 (1st Cir. 2019).

A.  MS-13

La Mara Salvatrucha, commonly known as MS-13, is a transnational gang headquartered in El Salvador and with extensive operations in the United States, including in Eastern Massachusetts.  The gang is organized into "programs" and "cliques."  Cliques are local groups that each belong to a regional program.  Within each clique, the primary leader is called the "first word" and the second in command is called the "second word." Full members are known as "homeboys."  Individuals generally progress from "paro" to "chequeo" before becoming homeboys.[1] Chequeos often must perform a violent crime to earn a promotion to homeboy, though the requirement has varied over time and between cliques.  They are then beaten or "jumped" in as full members.

MS-13 has defined its primary mission as killing rivals, especially members of the 18th Street gang.  If possible, a homeboy is supposed to kill a rival gang member, known as a "chavala," on sight.  MS-13 members are also required to help out fellow gang members whenever they are asked.

---

[1]  There has been some variation over time and between cliques as to the ranks below homeboy, but that variation is not important to this case.

- 4 -

MS-13 members are forbidden from cooperating with law enforcement. A member who cooperates with law enforcement will have a "green light" put on him, which means he will be killed by other MS-13 members. MS-13 associates are not permitted to kill other MS-13 associates unless leadership, usually in El Salvador, puts a "green light" on the individual.

B. Defendants' Roles in MS-13

In 2014 and 2015, at the time of the events at issue in this case, each of the defendants was a full MS-13 member in a clique near Boston. Noe Salvador Pérez-Vásquez, a/k/a "Crazy," claimed to be the second in command of the Everett Locos Salvatrucha clique. Luis Solís-Vásquez, a/k/a "Brujo," was a homeboy in the Eastside Locos Salvatrucha clique. Hector Enamorado, a/k/a "Vida Loca" was a homeboy in the Chelsea Locos Salvatrucha clique.

C. Cooperating Witnesses

Law enforcement investigations of crimes by MS-13 members often use confidential sources, some of whom become witnesses in later prosecutions. In 2012 the FBI began working with a source to infiltrate the MS-13 cliques in the Boston area. This informant is known as cooperating witness 1 ("CW-1") or by his street name, "Pelon." The government gave CW-1 a car with recording equipment inside, which he used to work as an unlicensed taxicab driver. CW-1 posed as a drug dealer and began spending

time with various MS-13 members. He was eventually beaten in as a homeboy in the Eastside Locos Salvatrucha Clique. To advance the investigation he would regularly give rides to MS-13 members and record their conversations with him and each other. Additional details of CW-1's involvement were discussed in this court's opinion in United States v. Sandoval. 2021 WL 2821070, at *1-2.

CW-1 did not testify at the defendants' trial. CW-1 was the source of two types of evidence introduced by the government. First, the government introduced recordings and transcripts from CW-1's recording device of both conversations between MS-13 members and CW-1's conversations with MS-13 members. Second, some of the government's law enforcement witnesses testified about statements that CW-1 made to them in the course of their investigation.

D. The Murder of Jose Aguilar Villanueva

German Hernandez-Escobar, a/k/a "Terible," the leader of the Everett Locos Salvatrucha clique, was arrested in March 2015. Members of the clique, including second-in-command Pérez-Vásquez, believed that someone in the gang had "snitched" on Terible, and began an investigation. They concluded that Jose Aguilar Villanueva, a sixteen-year-old associate of MS-13 known as "Fantasma," had cooperated with the police and was responsible for Terible's arrest. MS-13 leaders in El Salvador issued a green

- 6 -

light to kill Villanueva and Pérez-Vásquez began planning that murder with others in MS-13.

Pérez-Vásquez told Josue Alexis De Paz, a/k/a "Gato," a chequeo seeking promotion to homeboy and Villanueva's roommate, that he would have to "participate" in Villanueva's death. Another MS-13 member nicknamed "Inocente" called De Paz and told him to bring Villanueva to a restaurant in Somerville. The plan was to take Villanueva from the Somerville restaurant to an MS-13 meeting place in Malden called "the Mountain" and murder him there. Inocente was arrested before he could execute this plan.

After the arrest of Inocente, another homeboy told De Paz that the Everett clique wanted Villanueva murdered soon, and that De Paz would have to murder Villanueva with the help of a chequeo, Manuel Diaz Granados, a/k/a "Perverso." On the day of the murder, Pérez-Vásquez spoke to De Paz and told him to plan the murder carefully.

On July 5, 2015, De Paz and Granados met at the home De Paz shared with Villanueva and waited for Villanueva to return from a day trip to the beach. When he returned, De Paz told Villanueva that the three of them needed to go out to look for a man who had broken into their house several days earlier. The three went to a park, De Paz "grabbed [Villanueva] from behind," and Granados began stabbing Villanueva with a large green-handled knife. Moments later, De Paz dropped Villanueva, took out a

folding knife, and stabbed Villanueva as well. Villanueva died from his injuries.

Afterward Pérez-Vásquez told De Paz that he would be promoted to homeboy for his participation in Villanueva's murder.

## E. The Cocaine-Trafficking Operation

In early December 2014, CW-1 asked Pérez-Vásquez and other MS-13 members if they were interested in performing a "protection detail" for drugs being moved from Boston to New Hampshire. Pérez-Vásquez and four other MS-13 members volunteered. On December 8, 2014, a government agent gave the MS-13 members five kilograms of cocaine and they delivered it to another undercover agent in New Hampshire. Each was paid $500 for this work.

## F. The Murder of Javier Ortiz

The defendants were also each involved in the planning and execution of the murder of Javier Ortiz, a reputed member of the 18th Street gang. Early in the morning on December 14, 2014, Enamorado went to an apartment in Chelsea where a woman sold tamales after the bars closed. There he saw Ortiz and some friends, who Enamorado believed to be 18th Street gang members and who had beaten him and burned his face with a cigarette the night before. Enamorado left the apartment and called Pérez-Vásquez repeatedly. When Pérez-Vásquez answered, Enamorado asked him to bring a clique-owned gun to him in Chelsea. Enamorado told Pérez-

Vásquez that he had encountered several 18th Street gang members, that they had beaten him the night before, and that he wanted the gun because he was going to kill them. Pérez-Vásquez, who was at a garage in Everett where MS-13 members would gather, relayed this information to Solís-Vásquez and two other gang members at the garage. Pérez-Vásquez decided that he would bring the clique gun to Enamorado, and Solís-Vásquez decided that he would go as well because he had another clique gun stored in the garage.

Pérez-Vásquez and Solís-Vásquez met Enamorado in Chelsea, where he was sitting on the steps outside the apartment. Pérez-Vásquez asked Enamorado where the "chavalas" were. Enamorado said he would go inside alone with the gun Pérez-Vásquez had brought, and told Solís-Vásquez to stay at the door of the apartment with the other gun so that no one could leave. Solís-Vásquez waited at the door for a brief time, but then went to the porch to smoke a cigarette with another MS-13 member. At the same time, Enamorado entered the apartment and walked over to the bathroom where Ortiz was. He shot Ortiz three times in the back, emerged from the bathroom and then shot Saul Rivera, another visitor to the apartment. Ortiz died from his injuries.

The apartment's owner and Saul Rivera both identified Enamorado in photographic lineups as the perpetrator within hours of the shootings.

G. The Arrest and Interrogation of Enamorado

After the murder of Ortiz, Pérez-Vásquez offered CW-1 $400 to drive Enamorado out of the state. CW-1 agreed and told the police about the plan. On December 16, 2014, CW-1 picked up Enamorado, Pérez-Vásquez, and Pérez-Vásquez's girlfriend to drive out of Massachusetts. The police pulled them over and arrested Enamorado.

Chelsea Police Officer David Delaney booked Enamorado in English. Enamorado's first language is Spanish. Delaney testified that Enamorado appeared to understand him. Delaney marked on an intake form that Enamorado did not appear to be under the influence of drugs or alcohol. In response to Delaney's questioning, Enamorado told Delaney that he had not consumed drugs or alcohol that day.

After booking, Chelsea Police Detective Steven Garcia and State Trooper Timothy O'Connor interviewed Enamorado in Spanish. Detective Garcia testified that he did not observe any signs that Enamorado was intoxicated. Garcia gave Enamorado a written form in Spanish that described his Miranda rights. Garcia read the form aloud and Enamorado signed a waiver of his Miranda rights under the name Jesus Gonzales.

During the interrogation, Enamorado admitted to being a member of MS-13, that his name was Hector Enamorado, and that his nickname was Vida Loca. He said that on the day before the murder of Javier Ortiz, he had gotten into an altercation with several

- 10 -

18th Street gang members.  He claimed to have forgotten everything that happened on the night of the murder, but said that if he went back to the apartment, it would have been for revenge.

At the start of the interview, Trooper O'Connor pressed a button on the recording system to begin recording.  A green light on the recording system lit up to indicate that the interview was being recorded.  However, in February 2017, the officers learned that the audio recording had failed about 20 seconds into the interview.  The entirety of the video recording was preserved.

## II. Procedural History

A. <u>Pre-Trial</u>

In 2016, the defendants were each charged with conspiracy to conduct affairs through a pattern of racketeering activity (RICO conspiracy) in violation of 18 U.S.C. § 1962(d).  Pérez-Vásquez was also charged with conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and conspiracy to distribute marijuana in violation of 21 U.S.C. § 846.  Each was convicted of all charges, except that Pérez-Vásquez was acquitted on the firearms charge.

The defendants filed various motions in limine asking to limit or exclude expert testimony before trial.  During the final pretrial conference, the district court said it would "permit

expert testimony as to things such as symbols or colors or slang or the organization or structure of MS-13." The district court would not permit "an overview of the evidence or a broad description of the investigation." It also instructed that the defendants "may have to object to preserve a[ny] particular point."

Enamorado also moved to suppress the statements he made in custody on December 16, 2014, arguing that he did not knowingly, intelligently, and voluntarily waive his Miranda rights because he was under the influence of drugs and alcohol at the time and because he was not "intellectually, emotionally, or physically able to understand his rights." He added that the failure to make a full audio recording rendered the statements inadmissible. The district court denied the motion, stating that there was insufficient evidence Enamorado was intoxicated or failed to understand the officers, and that the failure of the audio equipment did not justify suppression.

B. Trial

The trial was conducted over nineteen days from March 27 to April 23, 2018. Through the reading of exhibits and the testimony of both law enforcement and MS-13 members, the government offered evidence both as to the murders and trafficking described above and as to a host of other crimes. The defendants presented no witnesses and did not testify.

The government's first witness was George Norris, a gang investigator analyst for the state attorney's office in Maryland. Based on his professional experience, Investigator Norris testified as to MS-13's history, structure, rules, symbols, and practices. Investigator Norris did not participate in the investigation of this case.

Investigator Norris explained that his knowledge of MS-13 was gained through "interviews and interrogations, both in custody and out of custody of gang members or associates, interviewing witnesses of crimes that involve MS-13, interviewing family members of MS-13 members or associates, interviewing other law enforcement officers, . . . interviewing victims of gang crimes, reading books, watching documentaries . . . [and] social media monitoring and harvesting intelligence off of social media." He also was trained at several conferences about gangs in general and MS-13 in particular.

Agent Jeffrey Wood, an FBI supervisor for the gang squad and the lead investigator during part of the investigation of the MS-13 cliques in Boston, testified next. He first spoke about the transnational structure of the gang and then about its structure in Massachusetts. He next testified about his investigations into the broader East Coast Program and his work with CW-1.

Agent Wood also testified as to various pieces of evidence his team recovered during a large scale "sweep" of arrests

of MS-13 members in January 2016. He described an MS-13 "rule book" found at a gang member's house and a set of WhatsApp messages between Pérez-Vásquez and other gang members that listed additional guidelines for proper conduct in MS-13.

Agent Wood next testified as to his work with another cooperating witness, CW-5. He arranged for CW-5 to pose as an MS-13 member and record a conversation with Inocente while he was being held at the Essex House of Corrections. Inocente described what he knew about the murder of Villanueva and the roles played by Enamorado and Pérez-Vásquez in the Ortiz murder. The transcript of this recording was admitted into evidence. Agent Wood also described his role in organizing the drug "protection detail" that Solís-Vásquez participated in and his role in the investigation of the Villanueva murder.

Massachusetts State Trooper Brian Estevez read into evidence a number of transcripts of recorded phone calls between MS-13 members, introduced evidence extracted from Villanueva's and others' cellphones, and explained how the FBI wiretapped CW-1's phone. He also introduced various recordings made by CW-1, and explained his involvement in Enamorado's arrest.

Several MS-13 members who had pled guilty testified for the prosecution. They each described their roles in MS-13, the "rules" of the organization, and crimes they had personally

committed as part of MS-13.[2]  They also testified as to conversations between them and other MS-13 members about the ongoing activities of the gang and the various crimes other MS-13 members had committed.

At the close of evidence all of the defendants moved for a directed verdict based on the sufficiency of the evidence.  The district court denied the motions.

In Pérez-Vásquez's closing statement, his lawyer conceded that Pérez-Vásquez was part of MS-13, that MS-13 was a criminal enterprise, and that he had brought a gun to "Vida Loca." Pérez-Vásquez's lawyer then argued that he could not be found guilty of the Ortiz murder because he "didn't share the intent that Mr. Enamorado had at the time he discharged that weapon into Mr. Javier Ortiz."

After Pérez-Vásquez's closing argument, Enamorado's counsel moved for a mistrial, arguing that "[t]he co-defendant has just become a witness against my defendant without notice in violation of Bruton, and there's no way this jury now is going to be able to give Mr. Enamorado a fair verdict after what just happened."  The district court summarily denied the motion. Enamorado's counsel did not request a limiting instruction.

---

[2]  De Paz testified as to his involvement in the murder of Villanueva, and that Pérez-Vásquez had ordered the murder.  Jose Hernandez-Miguel, a/k/a "Muerto," testified about the murder of Javier Ortiz.

- 15 -

On April 17, 2018, the district court conducted a jury charge conference. The district court told the defendants that as to the murders of Villanueva and Ortiz, it would only give a second-degree murder instruction, not a first-degree murder instruction. The defendants said they did not object. The defendants also did not object to the proposed instructions as to the RICO conspiracy. After the finalized instructions were read to the jury on April 18, the district court asked the defendants if they had "[a]nything further on the jury instruction[s]." Each defendant said no.

The jury convicted all three defendants of RICO conspiracy, with special findings that each was guilty of murdering Javier Ortiz as a part of the conspiracy. The jury also found that Pérez-Vásquez had participated in the murder of Villanueva. Pérez-Vásquez was convicted of conspiracy to possess with intent to distribute more than five kilograms of cocaine, and conspiracy to possess with intent to distribute marijuana. He was found not guilty of the firearms charge.

## C. Sentencing

The United States Probation Office calculated Pérez-Vásquez's advisory guidelines sentence as life imprisonment based on an offense level of 50 (revised downward to the maximum offense level of 43) and a criminal history category of IV. Pérez-Vásquez did not object. The district court sentenced Pérez-Vásquez to

concurrent terms of life imprisonment on the RICO conspiracy and cocaine conspiracy charges.[3]

The district court calculated Enamorado's guideline offense level as 44 (revised downward to a maximum offense level of 43) based on an underlying offense of first-degree murder and determined that his criminal history was category II. The guidelines recommendation was life imprisonment. Enamorado challenged the calculation of the guidelines range, arguing that because the jury had not specifically found that Enamorado was guilty of first- rather than second-degree murder, his guidelines base offense level should have been 38. He also argued that the evidence did not support that he had committed first, rather than second-degree murder, and that a criminal history category of II was inappropriate given that his previous offenses were "fairly minor." The district court rejected the first argument, stating that the degree of murder was "a matter of guideline interpretation for the Court, not something that the jury would find." It then found that, given the evidence presented, it was appropriate to apply the first-degree murder guideline. It did not address the criminal history category. The district court sentenced Enamorado to life imprisonment.

---

[3] He was also sentenced to a concurrent term of five years for the marijuana charge and a five-year term of supervised release.

The district court calculated that Solís-Vásquez's guidelines offense level was 43 for the murder of Javier Ortiz. It then increased the offense level to 45 based on Solís-Vásquez's involvement in the Rivera shooting, two other assaults, and one other murder. The offense level was then revised downward to the maximum of 43.

Solís-Vásquez objected that there was insufficient evidence to show that he had committed first-degree rather than second-degree murder.[4] The district court rejected this challenge, explaining that "it's a fair inference from the evidence by a preponderance standard that there was a joint venture here to commit premeditated murder, that [Solís-Vásquez] knew exactly what the purpose of this was, [and that it was] intended to further that enterprise. The purpose was that 'Vida Loca' was going to kill a [rival gang member]."

The district court sentenced Solís-Vásquez to 420 months' imprisonment and five years of supervised release. The sentence was a below-guidelines sentence imposed after consideration of the relevant factors under 18 U.S.C. § 3553(a).

---

[4] Solís-Vásquez also challenged the portions of the guidelines calculation concerning the incidents other than the Ortiz murder.

The district court also ordered Pérez-Vásquez and Enamorado to pay $32,984.03 in restitution to Saul Rivera, and Solís-Vásquez to pay $16,492.01.

### III. Analysis

The defendants asserted a variety of claims as to their trial and sentencing.  We address each in turn.

#### A. Sufficiency of the Evidence

Enamorado and Solís-Vásquez each argue that the evidence was insufficient to support their convictions.  "[W]e review preserved challenges to the sufficiency of the evidence by asking 'whether, taking the evidence in the light most favorable to the jury's verdict, a rational jury could have found the defendant guilty beyond a reasonable doubt.'"  Leoner-Aguirre, 939 F.3d at 318 (quoting United States v. Hicks, 575 F.3d 130, 139 (1st Cir. 2009)).

#### 1. Enamorado's Sufficiency Claim

To secure a conviction for committing the "pattern of racketeering" RICO conspiracy charge at issue, the government was required to prove beyond a reasonable doubt that Enamorado knowingly joined the MS-13 conspiracy and "agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy."  Sandoval, 2021 WL 2821070, at *2 (quoting Leoner-Aguirre, 939 F.3d at 317).  Racketeering acts include "any act or

threat involving murder . . . [or] dealing in a controlled substance." 18 U.S.C. § 1961(1).

Enamorado argues that the evidence was insufficient to support his RICO conspiracy conviction because (1) there was no evidence he participated in, knew about, or agreed that others would commit any predicate acts of racketeering other than the murder of Javier Ortiz; (2) there was no evidence that the Chelsea clique, to which Enamorado belonged, was part of the larger MS-13 conspiracy or that members of the Chelsea clique had agreed to commit racketeering acts; and (3) there was insufficient evidence that the shooting of Ortiz was done in furtherance of the MS-13 conspiracy.

Each of these arguments fails. As to Enamorado's first two contentions, in addition to Trooper Estevez's testimony that Enamorado had admitted during his post-arrest interview to being a member of MS-13, the jury heard testimony from multiple witnesses who testified that they had met Enamorado at MS-13 gatherings before the Ortiz murder, that they understood him to be "from the Chelsea Locos clique" or that he had identified himself as such, and that he had also introduced himself as a homeboy. The jury could thus conclude that Enamorado had agreed to join the "Chelseas." So, too, could the jury conclude that the "Chelseas" were part of MS-13, in light of the witnesses' testimony describing that group as a "clique." The jury heard evidence that MS-13's

- 20 -

mission is to kill rivals, and a jury could also conclude that an individual who joined a gang with this mission therefore agreed that a member of the group would commit racketeering acts. To the extent Enamorado argues that joining the Chelsea clique would not have established this agreement in light of the lack of evidence as to activities of that clique and whether it was involved in a broader MS-13 conspiracy, the jury was not required to believe him on that score, particularly in light of evidence that Enamorado was involved with members of other MS-13 cliques who clearly understood Enamorado to have been part of an MS-13 clique.

As to Enamorado's third argument, there was sufficient evidence that the Ortiz murder was done in furtherance of the MS-13 conspiracy. Multiple MS-13 members identified Ortiz as an 18th Street gang member, the murder was committed with MS-13 weapons and help from two MS-13 members, and the murder fit in with the conspiracy's purpose of killing rivals.

### 2. Solís-Vásquez's Sufficiency Claim

Solís-Vásquez does not challenge the sufficiency of the evidence for his RICO conspiracy conviction, but he does argue that the evidence was insufficient to support the jury's special finding that he participated in the murder of Ortiz because there was no evidence he had the requisite intent for second-degree murder under Massachusetts law. To convict a defendant of second-degree murder under Massachusetts law, the government must show

- 21 -

that the defendant acted with "intent to kill; the intent to cause grievous bodily harm; or the intent to commit an act that, in the circumstances known to the defendant, created a plain and strong likelihood of death." Commonwealth v. Tavares, 30 N.E.3d 91, 99 (Mass. 2015).

There was sufficient evidence for the jury to conclude that Solís-Vásquez acted with the requisite intent for second-degree murder. Solís-Vásquez brought a gun to Enamorado after Enamorado said "he was going to kill" the 18th Street gang members at the after-hours bar. Mauricio Sánchez, a/k/a "Tigre," also testified that Solís-Vásquez said Enamorado "had gone inside to murder the guy he had come for" and that Solís-Vásquez "was ready for what he was going to do."

B. Suppression of Enamorado's December 16th, 2014 Statements to Police

Enamorado renews his argument on appeal that his December 16, 2014 statements to the police were inadmissible because Enamorado did not validly waive his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 498-99 (1966). He argues he was intoxicated during his interview and that the officers sometimes spoke to him in English, which is not his first language.[5] "In

_____

[5] Enamorado also argues that the audio equipment's malfunction "supports suppression." But he does not explain why and "there is no federal constitutional right to have one's custodial interrogation recorded." United States v. Meadows, 571

- 22 -

reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and conclusions of law de novo." United States v. Mumme, 985 F.3d 25, 35 (1st Cir. 2021).

A Miranda waiver must be both voluntary and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The district court did not err in concluding that Enamorado voluntarily and knowingly waived his rights. Enamorado read and signed a waiver form in Spanish, and the record supports the district court's conclusion that he was not intoxicated at the time of arrest. See United States v. Mejia, 600 F.3d 12, 18 (1st Cir. 2010) (holding that waiver of Miranda rights was knowing and voluntary where Spanish-speaking defendant was given waiver form in Spanish).

C. The Admission of Coconspirator Statements

Pérez-Vásquez and Solís-Vásquez challenge the admission of various coconspirator statements.[6] Because they failed to renew

_____

F.3d 131, 147 (1st Cir. 2009).

[6] The defendants' arguments are waived with respect to any statements not identified in their briefs on appeal as wrongly admitted. United States v. Perez-Cubertier, 958 F.3d 81, 88 n.6 (1st Cir. 2020) (explaining that in challenging the admission of evidence, the "failure to identify relevant portions of the trial transcript" "hamstrings" appellate review and may result in waiver (quoting González-Ríos v. Hewlett Packard PR Co., 749 F.3d 15, 20 (1st Cir. 2014))).

- 23 -

their objections at the close of evidence, the challenge is reviewed for plain error. See United States v. Ford, 839 F.3d 94, 106 & n.9 (1st Cir. 2016).

Statements made by a "coconspirator during and in furtherance of the conspiracy" are nonhearsay. Fed. R. Evid. 801(d)(2)(E). "[A] coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." United States v. Ciresi, 697 F.3d 19, 28 (1st Cir. 2012) (quoting United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002)). Statements made to "foster[] a relationship of trust" or keep coconspirators "abreast of current developments and problems facing the group" may further the conspiracy. United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005) (quoting United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000)); see also United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993) ("[T]he reporting of significant events by one coconspirator to another advances the conspiracy."). It is

The defendants also argue that the admission of statements made in furtherance of the conspiracy by non-testifying coconspirators violated the Confrontation Clause. This argument fails because "'[s]tatements made during and in furtherance of a conspiracy are not testimonial' and are, therefore, not subject to Sixth Amendment concerns." United States v. Rivera-Donate, 682 F.3d 120, 132 n.11 (1st Cir. 2012) (quoting United States v. Malpica-García, 489 F.3d 393, 397 (1st Cir. 2007)).

"immaterial" whether the statement was made to a government informant posing as a coconspirator. See Ciresi, 697 F.3d at 28.

Pérez-Vásquez and Solís-Vásquez argue that many of the admitted statements were "idle chatter" or "gossip" not in furtherance of the conspiracy. We address the coconspirator statements mentioned in the defendants' briefs in turn.

Three of the challenged statements were not admitted as coconspirator statements or for the truth of the matter asserted but for other reasons.[7] These challenges fail.

---

[7] Trooper DeMeo's statements about what De Paz told him about the murder of Villanueva were admitted not for the truth of the matter asserted but as context to explain how Villanueva's statements affected his investigation. We have cautioned that the idea that "any statement by an informant to police which sets context for the police investigation" is admissible is "impossibly overbroad." United States v. Maher, 454 F.3d 13, 22 (1st Cir. 2006). In this case, however, the district court allowed the testimony because De Paz was the next witness and would testify as to the facts restated by Trooper DeMeo. Thus there was no significant risk of prejudice as required under the plain error standard.

Similarly, Trooper Estevez testified that he had received a call from CW-1 advising that MS-13 members were attempting to move Enamorado out of state. But the government immediately after that testimony introduced a transcript of a call between Pérez-Vásquez and CW-1 in which Pérez-Vásquez offered to pay CW-1 to take an MS-13 member out of state, and the officers did in fact arrest Enamorado in CW-1's car. Enamorado was not prejudiced by Estevez's testimony.

The statements of "La Diablita" in the jailhouse recording were also admitted not for their truth but for context as to what Terible told La Diablita. See United States v. Walter, 434 F.3d 30, 33-34 (1st Cir. 2016) (explaining that portions of discussion "were properly admitted as reciprocal and integrated utterance(s)" to make admissible statements "intelligible to the jury" (quoting United States v. McDowell, 918 F.2d 1004, 1007 (1st

- 25 -

The challenge to Sánchez's statement that Pérez-Vásquez told two other members of MS-13 to give him a ride to Lynn to buy drugs also fails, as it was clearly in furtherance of the conspiracy to purchase drugs for the gang's marijuana business. And as to Pérez-Vásquez, his own statement is admissible against him under Federal Rule of Evidence 801(d)(2)(A).

As to the admission of testimony from Sánchez, Jose Hernandez-Miguel, a/k/a "Muerto," and another codefendant, Julio Esau Avalos-Alvarado, describing conversations they had with other gang members about the Ortiz and Villanueva killings, we see no plain error in the district court's determination that these statements were coconspirator statements because "gang members informing each other after the fact about gang business further[s] the interests of the gang, among other things, [by] keeping them informed and advising them about enforcement of the rules and general state of affairs." Nor was there plain error in the district court's admitting the statements of "Inocente" to CW-5 because they served "to promote and encourage violence, to enforce gang discipline, and to inform gang members of ongoing events."

Cir. 1990))).

The admission of statements not admitted to prove the truth of the matter asserted also does not violate the Confrontation Clause. United States v. Occhiuto, 784 F.3d 862, 866 n.2 (1st Cir. 2015).

- 26 -

Enamorado separately challenges the admission of all coconspirator statements not discussing him or the Ortiz killing, arguing that because he was not a member of the wider MS-13 conspiracy, such statements could not be admitted against him under Federal Rule of Evidence 801(d)(2)(E). For the reasons explained in the discussion of the sufficiency of the evidence, this argument fails. He also argues that any statements made by coconspirators after his arrest were inadmissible against him because he was no longer a part of the conspiracy. As he made no showing that he had actually withdrawn from the conspiracy, this argument is foreclosed by Leoner-Aguirre, 939 F.3d at 318 ("Imprisonment alone does not satisfy a defendant's burden of proving withdrawal.").

D. The Admission of CW-1's Statements

Enamorado challenges the admission of all of CW-1's statements made to law enforcement or in the recordings submitted by the government.[8] He argues that CW-1 was not a coconspirator and thus that his statements are not nonhearsay under Federal Rule

---

[8] Pérez-Vásquez adopted this argument.

Pérez-Vásquez also adopted very similar arguments made by Erick Argueta Larios, a/k/a "Lobo." United States v. Larios, No. 18-2177. But Pérez-Vásquez does not explain how the specific statements by CW-1 challenged by Larios, many of which have little to do with Pérez-Vásquez's involvement with the conspiracy, prejudiced Pérez-Vásquez. The argument is waived. See United States v. Torres-Rosa, 209 F.3d 4, 7 (1st Cir. 2000) ("The party seeking to adopt an argument has a burden, at the very least, to ensure that it is squarely before the court and to explain how and why it applies in his case.").

of Evidence 801(d)(2)(E), and that their admission violated the Confrontation Clause. Because this argument was preserved, we review the admission of alleged hearsay evidence for abuse of discretion, United States v. Correa-Osorio, 784 F.3d 11, 24 (1st Cir. 2015), and the Confrontation Clause claim de novo, United States v. Veloz, 948 F.3d 418, 430 (1st Cir. 2020).[9]

Enamorado's brief focuses on Exhibit 214, the transcript of a conversation a few hours after the Ortiz murder between CW-1, Pérez-Vásquez, a woman named "Blanca," and another MS-13 member known as "Smiley." CW-1's statements in this transcript were mostly questions, exclamations, or statements not relevant to the Ortiz murder.

Enamorado's argument misses the point. CW-1's statements were admitted only to provide context for statements made by other MS-13 co-conspirators in the conversation and make them intelligible to the jury, not for their truth. And the district court did not err in admitting CW-1's statements in Exhibit 214 to provide context. See United States v. Walter, 434 F.3d 30, 33-34 (1st Cir. 2016) (holding that tape-recorded statements by non-testifying informants may be admissible to

_____

[9] Enamorado challenges "all" of CW-1's statements, but his argument is waived as to any statements not identified in his brief. Perez-Cubertier, 958 F.3d at 88 n.6 (explaining that the "failure to identify relevant portions of the trial transcript" may result in waiver).

- 28 -

provide context for statements made by defendants); see also Sandoval, 2021 WL 2821070, at *19 (holding that there was no plain error in admitting cooperating witness's "reciprocal and integrated utterance(s)" in conversations with conspiracy members (quoting Walter, 434 F.3d at 34)). The admission of such statements also does not violate the Confrontation Clause. Walter, 434 F.3d at 34 ("[S]tatements . . . offered not for the truth of the matters asserted . . . do not implicate the Confrontation Clause.").

Enamorado also specifically challenges CW-1's "identification" of the speakers in Exhibit 214. It is unclear what identification Enamorado is challenging. If Enamorado is challenging the fact that CW-1 referred to various MS-13 members by their names in the recordings, this challenge is rejected because using someone's name in a conversation is not an assertion. See United States v. Weeks, 919 F.2d 248, 251 (5th Cir. 1990). If he is challenging the fact that CW-1 provided the identities of the speakers for the transcripts, it was Hernandez-Miguel, a coconspirator who testified at trial, not CW-1, who provided the voice identification for the recordings and their transcripts.

Enamorado also challenges the admission of CW-1's statements in Exhibit 240, a transcript of a recorded conversation between CW-1 and Pérez-Vásquez on October 13, 2015, in which they discussed the Ortiz murder. After reviewing the transcript we see

- 29 -

no reversible error in admitting CW-1's statements to provide context for Pérez-Vásquez's statements. Most of CW-1's statements are mere interjections or "reciprocal and integrated utterance(s)." Walter, 434 F.3d at 34. And we are satisfied that to the extent any statements could not be so understood, their admission was harmless. See United States v. Benitez-Avila, 570 F.3d 364, 372 (1st Cir. 2009) (rejecting hearsay argument on appeal because any error was harmless). For example, as to CW-1 saying "Look at [Enamorado]. You see how fast they had him on the news?," there was no dispute as to whether Enamorado was quickly identified as the shooter.

E. The Admission of Law Enforcement Testimony

### 1. Expert Testimony Founded on Hearsay

Pérez-Vásquez and Enamorado argue that elements of Investigator Norris's, Agent Wood's, and Trooper Estevez's expert testimony were improperly admitted and violated the Confrontation Clause because they were merely relaying improper hearsay evidence rather than providing expert analysis. This unpreserved challenge to the admission of testimony is reviewed for plain error. United States v. Laureano-Pérez, 797 F.3d 45, 63 (1st Cir. 2015).

As explained in United States v. Sandoval, "properly qualified experts whose work is based on reliable principles and methods may rely on inadmissible hearsay evidence in forming an expert opinion" as long as they "relay[] that opinion, once formed,

through their own testimony." 2021 WL 2821070, at \*12; see also United States v. Rios, 830 F.3d 403, 418 (6th Cir. 2016) ("[I]t is the process of amalgamating the potentially testimonial statements . . . that separates an admissible [expert] opinion [on a criminal organization] from an inadmissible transmission of testimonial statements.").

As to Investigator Norris's testimony, he did not repeat improper hearsay evidence and the defendants do not explain how any of his statements were improper. Rather, based on his experience and synthesis of various materials, he provided evidence, helpful to the jury, about the structure and rules of MS-13.

As to Agent Wood, in most of the portions challenged by the defendants on this ground, Agent Wood is testifying as to what he personally observed during the investigation, not as an expert. And his testimony about the basic structure of MS-13 was based on a synthesis of his many years of experience investigating MS-13. See Sandoval, 2021 WL 2821070, at \*12-13.

As to Trooper Estevez, most of the challenged testimony is a description of Trooper Estevez's personal involvement in the investigation or Trooper Estevez reading aloud already admitted transcripts of conversations between MS-13 members. As to the transcripts, we have already rejected the defendants' challenges to the statements in those transcripts. As to the statement

specifically challenged by Enamorado, that it was "common in some cliques" for members to try to hide the fact they were making money from illegal activities from their clique, Estevez made that statement on cross-examination by Pérez-Vásquez's lawyer to explain an admitted recording in which an MS-13 member was explaining that "[a]nother thing about [the drug protection details] is not to tell everyone . . . [b]ecause they get jealous, homie, and all that." The admission of Estevez's statement was not an abuse of discretion, much less plain error, because it was a permissible statement based on his experience investigating MS-13. See United States v. Belanger, 890 F.3d 13, 29 (1st Cir. 2018) (holding that agent's testimony commenting on meaning of recorded calls was property admitted where agent was "intimately involved in the investigation" and "well suited to contextualize individual affairs like [the] phone call").[10]

---

[10] Enamorado also argues that the court should not have admitted Estevez's statement that the Suffolk County District Attorney's Office had identified a suspect for the Ortiz killing because he did not have an opportunity to cross-examine someone from the District Attorney's Office. In fact, Trooper O'Connor, who was in the Suffolk County Detective Unit, had already testified that they had identified Enamorado as a suspect, and Enamorado had the opportunity to cross-examine him. Enamorado was not prejudiced by the admission of Estevez's statement and there was no plain error.

### 2. Overview Testimony

Pérez-Vásquez argues that much of the testimony by law enforcement officers was improper "summary overview" evidence.[11] Overview testimony refers to the use of a witness to "map out [the government's] case and to describe the role played by individual defendants." United States v. Flores-De-Jesús, 569 F.3d 8, 16 (1st Cir. 2009) (quoting United States v. Casas, 356 F.3d 104, 117 (1st Cir. 2004)). Such testimony is improper because it may describe evidence that never materializes and, if the witness is a government agent, may lend the imprimatur of government to a later-testifying witness. Id. at 16-17. "Where an officer testifies exclusively about his or her role in an investigation and speaks only to information about which he or she has first-hand knowledge, the testimony is generally . . . permissible." United States v. Meléndez-González, 892 F.3d 9, 18 (1st Cir. 2018) (alteration in original) (quoting United States v. Rose, 802 F.3d 114, 121 (1st Cir. 2015)). In describing his investigation, an officer may not make "conclusory statements about the defendant's

---

[11] Solís-Vásquez joined this argument.

Pérez-Vásquez also hints at an argument that it was impermissible for law enforcement witnesses to testify both as expert witness and fact witnesses. The argument is waived for lack of developed argumentation, and in any event "there is no per se prohibition against a witness testifying in both capacities." Sandoval, 2021 WL 2821070, at *12.

culpability." United States v. Rodríguez-Adorno, 695 F.3d 32, 38 (1st Cir. 2012).

Because no objection was made in the district court, we review this claim for plain error. United States v. Iwuala, 789 F.3d 1, 5-6 (1st Cir. 2015). We see no prejudicial overview evidence in the record. Some of the testimony the defendants identify as "overview" evidence is better described as expert testimony.[12] The remainder consists of Agent Wood's and Trooper Estevez's description of their own roles in the investigation or the reading of already admitted transcripts.[13]

### 3. Expert Methodology

Enamorado argues in one sentence that all of the experts' methodologies were inadequate. Because he failed to develop the argument, it is waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

---

[12]    For example, the defendants characterize as overview evidence the expert testimony about "the [MS-13] organization, rules, and practices of MS-13, [and] the nomenclature and leadership structure of MS-13."

[13]    The government concedes that Agent Wood's statement that he recognized the gang name "Crazy" as an MS-13 member from the Everett Loco Salvatrucha clique could be viewed as an improper conclusory statement about Pérez-Vásquez's guilt. But Pérez-Vásquez admitted his membership in MS-13, so any error in admitting this statement was harmless. See Flores-De-Jesús, 569 F.3d at 28, 30 (rejecting argument about overview evidence on appeal because any error was harmless).

Pérez-Vásquez also adopts, without elaboration, the argument of Herzzon Sandoval, a codefendant who was part of a different trial group, that Agent Wood's testimony was improperly admitted because the government failed to show that the evidence was based on a reliable methodology.[14] But the testimony challenged by Sandoval at his trial is entirely distinct from the testimony given by Agent Wood at Pérez-Vásquez's trial, and to the extent the circumstances are the same as in Sandoval, the Court rejected the argument. See Sandoval, 2021 WL 2821070, at *10. To the extent they are different, Pérez-Vásquez has not explained how and so has waived this argument. See United States v. Torres-Rosa, 209 F.3d 4, 7 (1st Cir. 2000).

### F. Jencks Act

Enamorado argues that the government violated the Jencks Act, 18 U.S.C. § 3500, by failing to disclose all of Investigator Norris's prior testimonies as an expert witness. The Jencks Act requires, on motion of the defendant, the government to turn over any "statement" of a government witness "relating to the subject matter of that witness's testimony" after the witness has been called by the United States and has testified on direct

---

[14] Pérez-Vásquez also adopts Sandoval's argument that cross-examination of Wood was improperly limited and that a "Threat Assessment" should have been turned over under the Jencks Act. It is unclear how these arguments are relevant or can be applied in this case.

examination.  United States v. Landrón-Class, 696 F.3d 62, 72-73 (1st Cir. 2012); see 18 U.S.C. § 3500(b).  Enamorado's argument fails because transcripts of a witness's prior testimony, which are available in the public record, are not Jencks Act material.  See United States v. Hensel, 699 F.2d 18, 39-40 (1st Cir. 1983); United States v. Chanthadara, 230 F.3d 1237, 1254-55 (10th Cir. 2000) (collecting cases).

## G. Pérez-Vásquez's Closing Argument

Enamorado argues that Pérez-Vásquez's closing argument unconstitutionally prejudiced Enamorado and thus that he was entitled to a mistrial.  Enamorado first argues that the closing argument was effectively a confession made by Pérez-Vásquez's attorney on behalf of Pérez-Vásquez and thus that it was allowed in violation of Bruton v. United States, 391 U.S. 123 (1968).  He then argues that Pérez-Vásquez's closing argument made clear that Enamorado's defense was irreconcilable with Pérez-Vásquez's defense, and thus that he was entitled to a mistrial and severance. The denial of a mistrial is reviewed only for "manifest abuse of discretion."  United States v. Chisholm, 940 F.3d 119, 126 (1st Cir. 2019).  Bruton challenges are reviewed de novo.  United States v. Padilla-Galarza, 990 F.3d 60, 75-76 (1st Cir. 2021).

As to Enamorado's first contention, "[a] defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant

in the crime is introduced at their joint trial." Richardson v. Marsh, 481 U.S. 200, 201 (1987); see also Bruton, 391 U.S. 123. That is not what happened here. The challenged statements were made to convince the jury that Pérez-Vásquez was not guilty for lack of intent. We do not think a reasonable jury would have concluded that this argument was actually a confession by Pérez-Vásquez stating that a different defendant, Enamorado, was guilty of RICO conspiracy. Enamorado did not ask for any curative instruction, further evidencing that the jury did not need to be cautioned. And the jury was instructed that "[l]awyers are not witnesses. What they say in their . . . closing arguments . . . is not evidence." See United States v. Quintero, 38 F.3d 1317, 1342 (3d Cir. 1994) (stating that Bruton "does not apply when an attorney for a co-defendant implicates the defendant during closing argument"); United States v. Sandini, 888 F.2d 300, 311 (3d Cir. 1989) ("Bruton is directed toward preserving a defendant's right to cross-examination, and thus has nothing to do with arguments of counsel," which "are simply not evidence.").

We also reject Enamorado's argument that the closing statement rendered Enamorado and Pérez-Vásquez's defenses so irreconcilable as to require a severance. "[T]o gain a severance based on antagonistic defenses, the antagonism . . . must be such that if the jury believes one defendant, it is compelled to convict the other defendant." United States v. Floyd, 740 F.3d 22, 36

(1st Cir. 2014) (second alteration in original) (quoting United States v. Peña-Lora, 225 F.3d 17, 33 (1st Cir. 2000)). "Courts measure the level of antagonism by the evidence actually introduced at trial. And argument by counsel is not -- repeat, not -- evidence." Chisholm, 940 F.3d at 128 (cleaned up) (rejecting claim that drug-trafficking defendant was entitled to severance where codefendant's closing and opening statements repeatedly stated he was a "large-scale, sophisticated heroin trafficker"). Because closing arguments are not evidence, the district court did not manifestly abuse its discretion in denying the motion for a mistrial based on Pérez-Vásquez's closing argument.

## H. The Government's Closing Argument

Enamorado argues that the government's statements during its closing argument were improper and prejudicial.

We review Enamorado's unpreserved challenges to the government's closing argument for plain error. United States v. Belanger, 890 F.3d 13, 34 (1st Cir. 2018). We must determine "whether the challenged comment [was] obviously improper," and, if so, "whether the comment 'so poisoned the well that the trial's outcome was likely affected.'" United States v. Walker-Couvertier, 860 F.3d 1, 10 (1st Cir. 2017) (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)). In making this determination, we consider "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or

- 38 -

accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants." Belanger, 890 F.3d at 34 (quoting United States v. Wihbey, 75 F.3d 761, 772 (1st Cir. 1996)).

Enamorado first argues that the government falsely stated that Enamorado called Pérez-Vásquez "to be backup" because "[Enamorado] didn't have anyone from his clique available to do it." Even if that statement were not well-supported by the record, it was an "isolated and minor comment[] in the context of a much larger web of evidence pointing to [the defendant's] guilt" and does not cast doubt on the conviction. United States v. French, 904 F.3d 111, 125 (1st Cir. 2018).

Enamorado next argues that the government's statement that Ortiz was an 18th Street gang member was improper because it was inconsistent with testimony from FBI Special Agent Wood in a codefendant's prior trial that he did not know whether Ortiz was an 18th Street gang member. The importance of Ortiz's gang affiliation is that it supports the contention that the Ortiz murder was done in furtherance of MS-13's purposes. Because the government provided substantial evidence that Enamorado believed Ortiz was an 18th Street gang member, Ortiz's actual affiliation was unimportant to the outcome and there was no plain error.

Enamorado also argues that the government misstated the law by telling the jury that it could convict Enamorado based solely on his participation in the Ortiz murder. This argument fails. The government did twice state during closing arguments that the murder was enough to convict Enamorado. Those statements were incorrect, but in the remainder of the prosecutor's closing argument he properly stated that in order to be convicted for RICO conspiracy, the Ortiz murder had to be done in connection with the MS-13 enterprise. Further, the court properly instructed the jury as to the applicable law. See United States v. Gonzalez-Gonzalez, 136 F.3d 6, 9 (1st Cir. 1998) ("No juror would mistake a prosecutor for a judge.")

I. Enamorado's Challenge Under Federal Rule of Evidence 403

Enamorado argues for the first time on appeal that the admission of evidence regarding the wider MS-13 organization and crimes committed by members of other cliques of which Enamorado had no personal knowledge was unduly prejudicial. Federal Rule of Evidence 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." Unpreserved 403 challenges are reviewed for plain error. United States v. Casanova, 886 F.3d 55, 63 (1st Cir. 2018).

In United States v. DeCologero, we stated that where a defendant is engaged in a RICO conspiracy, evidence of crimes

committed within the scope of that conspiracy are relevant "to prove the existence and nature of the RICO enterprise and conspiracy," even if the defendant had no personal involvement in the crime. 530 F.3d 36, 54 (1st Cir. 2008). Further, it was "far from clear that the potentially prejudicial impact of [such] evidence would have rendered it inadmissible under Federal Rule of Evidence 403." Id. There was no plain error in admitting evidence against Enamorado of the crimes committed in furtherance of the broader MS-13 conspiracy.

J. Jury Instructions

Enamorado challenges two aspects of the jury instructions.[15] Because Enamorado failed to object in the district court, we review the instructions for plain error. United States v. González-Vélez, 466 F.3d 27, 34-35 (1st Cir. 2006).

The district court instructed the jury that to prove a RICO conspiracy the government must show that "the defendant or another member of the conspiracy agreed to commit at least two racketeering acts." (Emphasis added). It next stated that "[f]or each defendant, the government . . . must prove that the defendant agreed to participate in the conspiracy and that the conspiracy involved, or would involve, the commission of at least two racketeering acts." Enamorado argues that the first portion of

---

[15]    Pérez-Vásquez adopted this argument.

these instructions improperly instructed the jury that it could convict Enamorado whether or not Enamorado knew the conspiracy would involve the commission of at least two racketeering acts.

The first portion of the instruction accurately conveyed that if Enamorado agreed to join a conspiracy in which coconspirators had agreed to do two or more acts, then Enamorado himself need not have done those acts. Enamorado did not at any time propose a more artful phrasing. Any risk of the jury misunderstanding was eliminated by the very next sentence. Instructions are not viewed piecemeal. United States v. Paz-Alvarez, 799 F.3d 12, 23 (1st Cir. 2015). There was no plain error.

Enamorado next argues that the district court's murder instructions were error under Alleyne v. United States, 570 U.S. 99 (2013).[16] The district court told the jury "[i]n this case, the distinction between first-degree and second-degree murder is not relevant" and that it would "simply describe the elements of murder" to the jury. But at the charge conference the district court made clear that it would instruct the jury on second-degree murder "without calling it second-degree murder" to streamline the charge. And the instructions given to the jury clearly described second-degree murder.

---

[16] Pérez-Vásquez adopts this argument.

- 42 -

It is not clear what argument Enamorado is making. If he is arguing that the district court was required to instruct on first-degree murder in addition to second-degree murder, that argument fails because there was no prejudice to Enamorado. Enamorado argues there was prejudice because if both instructions had been given and the jury had only found him guilty of second-degree murder, the district court would have calculated a lower guidelines range. As explained in United States v. Gonzalez, 981 F.3d 11 (1st Cir. 2020), a district court may use the first-degree murder guideline if it finds by a preponderance of the evidence that the defendant committed first-degree murder, even if the jury only finds the defendant guilty of second-degree murder, id. at 16-17. And the district court said it thought the evidence was "overwhelming . . . that the murder of Ortiz was premeditated."

K. Responses to Jury Questions

Enamorado challenges the district court's responses to two jury questions asked during deliberations. The first question was: "Is it required to prove that the defendant is a gang member in order to be associated with MS-13? . . . [W]hat is the definition of an associate of MS-13?" The district court replied: "The answer to that question is no. The real issue is not whether a particular defendant is a full member of a gang, rather, the focus should be on the conspiracy and the agreement that is at the heart of the

conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity."

The second question was: "Does evidence of the defendant's association with MS-13 have to predate the specific racketeering acts charged in the indictment?" The district court replied: "[N]o. Again, the focus should be on the conspiracy and the agreement at the heart of the conspiracy. No specific racketeering acts need be committed at all."

Both answers were crafted in response to and in the presence of defense counsel. The district court read the final version of the instructions and asked the defendants "Does that work?" to which they replied "for the defendants, yes." This approval waived any later objection. United States v. Corbett, 870 F.3d 21, 30-31 (1st Cir. 2017) (explaining that a defendant waives any objection when says he has "no problem" with the proposed answer to a jury question).[17]

L. Sentencing Entrapment

Pérez-Vásquez argues his sentence was inappropriately enhanced due to sentencing factor manipulation. Because Pérez-Vásquez failed to raise this issue in the district court, we review

---

[17] Having rejected all of the defendants' claims of trial error, we reject their claim of cumulative error. Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998) ("Absent any particularized error, there can be no cumulative error.").

- 44 -

for plain error.  United States v. Sánchez-Berríos, 424 F.3d 65, 78 (1st Cir. 2005).

"Sentencing factor manipulation occurs 'where government agents have improperly enlarged the scope or scale of [a] crime'" during a sting operation.  United States v. Rivera-Ruperto, 852 F.3d 1, 14 (1st Cir. 2017) (alteration in original) (quoting United States v. Lucena-Rivera, 750 F.3d 43, 55 (1st Cir. 2014)).  In such cases, the sentencing court may impose a sentence below the mandatory minimum as an equitable remedy.  Id.  Because any sting operation involves manipulation, relief is available only in "the extreme and unusual case" such as in the case of "outrageous or intolerable pressure [by the government] or illegitimate motive on the part of the agents."  Id. at 15 (alteration in original) (first quoting Lucena-Rivera, 750 F.3d at 55; and then quoting United States v. Navedo-Ramirez, 781 F.3d 563, 580 (1st Cir. 2015)).  The burden is on the defendant to establish such manipulation by a preponderance of the evidence.  Id.

Pérez-Vásquez argues that the drug protection detail in which he was asked to move five kilograms of cocaine to New Hampshire was improper because "the only purpose" for using five kilograms of cocaine rather than a lesser amount was to enhance the defendants' sentencing exposure.  This argument fails, as the mere fact that agents could have but did not use smaller quantities of drugs in a sting operation "without more, does not establish

that the agents engaged in the kind of 'extraordinary misconduct' that is required of a successful sentencing manipulation claim." Id. (citation omitted) (quoting Sánchez-Berríos, 424 F.3d at 78).

M. Procedural Reasonableness of the Defendants' Sentences

The defendants make various challenges to the procedural reasonableness of their sentences.[18]  We review the procedural reasonableness of a sentence under a "multifaceted" abuse of discretion standard.  United States v. Flores-Quiñones, 985 F.3d 128, 133 (1st Cir. 2021).  We review factual findings for clear error, the interpretation of the guidelines de novo, and judgment calls for abuse of discretion.  Id.

All three defendants argue that the district court erred by calculating the guidelines range based on a judicial finding by the preponderance of the evidence that they were guilty of first-degree murder.  They argue that a jury was required to decide whether the murder was first- or second-degree under Alleyne, 570 U.S. 99.  This argument is foreclosed by our decision in Gonzalez, 981 F.3d at 16-17.

Enamorado argues that his criminal history category was miscalculated.[19]  We reject this challenge.  Because his base

_____

[18]  A heading in Enamorado's brief suggests he is challenging the substantive reasonableness of his sentence as well, but the argument was not developed and thus is waived. Zannino, 895 F.2d at 17.

[19]  Enamorado also argues that there was insufficient evidence that his murder of Ortiz was premeditated or committed as

offense level was 43, the criminal history category had no impact on his guidelines range. See U.S.S.G. ch. 5, pt. A (sentencing table); United States v. Magee, 834 F.3d 30, 38 (1st Cir. 2016) (rejecting challenge to criminal history category determination because any error was harmless). We also reject Enamorado's argument that he was entitled to a downward adjustment to his offense level for playing only a "minor" role in the conspiracy. Not only did Enamorado kill Ortiz, but he was also identified by several witnesses as a homeboy. MS-13 associates only become homeboys after ongoing participation in the gang and its activities. The district court's determination that Enamorado's role was not minor was not clear error. See United States v. Montes-Fosse, 824 F.3d 168, 172 (1st Cir. 2016).

Solís-Vásquez challenges the calculation of his guidelines range on the grounds that there was insufficient evidence to support the district court's conclusion by the preponderance of the evidence that he was responsible for first-degree rather than second-degree murder of Ortiz. For much the reasons described in the discussion of the sufficiency of the evidence, we see no clear error in the district court's conclusion

---

a part of the MS-13 conspiracy. We reject this argument for the same reasons we reject his sufficiency argument.

that Solís-Vásquez understood that the group was going to kill Ortiz and thus that the murder was premeditated.[20]

N. Effective Assistance of Counsel

Pérez-Vásquez argues that he was denied effective assistance of counsel because his counsel conceded some elements of the charged RICO conspiracy.

Ineffective assistance of counsel claims generally "cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." United States v. Tkhilaishvili, 926 F.3d 1, 20 (1st Cir. 2019) (quoting United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993)). Further, Pérez-Vásquez has not shown that the record here was "sufficiently developed to allow reasoned consideration" of the issue. Id. (quoting United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991)). We dismiss this claim of error without prejudice. Pérez-Vásquez may file a motion for post-conviction relief in the district court. See 28 U.S.C. § 2255.

---

[20] Solís-Vásquez also challenges whether there was sufficient evidence to support increasing his base offense level based on various other assaults and murders. Because there was no clear error in determining that Solís-Vásquez's base offense level was 43, the maximum, his base offense level was not affected by the other conduct and any error was harmless. See United States v. Acevedo-Hernández, 898 F.3d 150, 172 (1st Cir. 2018).

We have reviewed all additional claims made by the defendants and determined that each of them is without merit.

## IV. Conclusion

<u>Affirmed</u>.