# United States Court of Appeals
## For the First Circuit

Nos. 20-1275, 20-1276, 20-1283

UNITED STATES OF AMERICA,

Appellee,

v.

EDUARDO ROSARIO-ORANGEL, a/k/a Barba, a/k/a Cholon; AVELINO
MILLÁN-MACHUCA, a/k/a Papito Machuca, a/k/a El Fuerte, a/k/a
Viejo, a/k/a Gordo; LUIS H. QUIÑONES-SANTIAGO, a/k/a Hiram,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson, Circuit Judge,
Burroughs, District Judge.[*]

Kendys Pimentel-Soto, with whom Kendys Pimentel-Soto Law
Office LLC was on brief, for appellant Eduardo Rosario-Orangel.

Alejandra Bird López, with whom Eric Alexander Vos, Federal
Public Defender, Rachel Brill, Federal Public Defender, and Franco
L. Pérez-Redondo, Assistant Federal Public Defender, were on
brief, for appellant Avelino Millán-Machuca.

Javier A. Morales-Ramos, for appellant Luis H.
Quiñones-Santiago.

---

[*] Of the District of Massachusetts, sitting by designation.

Alexander L. Alum, Assistant United States Attorney, with W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Francisco A. Besosa-Martínez, Assistant United States Attorney, Juan Carlos Reyes-Ramos, Assistant United States Attorney, and Ricardo A. Imbert-Fernández, Assistant United States Attorney, on brief, for appellee.

---

March 20, 2026

---

BARRON, **Chief Judge**.  We once again address challenges that Luis H. Quiñones-Santiago, Eduardo Rosario-Orangel, and Avelino Millán-Machuca[1] bring to their federal convictions based on statements that they contend were wrongly admitted into evidence at their joint trial in the United States District Court for the District of Puerto Rico.  The convictions are, with respect to each of these defendants, for conspiracy to violate the Racketeer Influenced and Corrupt Organizations ("RICO") Act, see 18 U.S.C. § 1962(d), and conspiracy to possess with intent to distribute a controlled substance, see 21 U.S.C. § 846.

In an earlier opinion in these consolidated appeals, we rejected these three defendants' other challenges to their convictions.  We explained at that time, however, that we could not resolve their challenges based on alleged hearsay statements because the District Court had not made key findings about their admissibility.  For the same reason, we also explained that we could not resolve Millán's challenge based on cumulative error, because we concluded that the findings, once made, might bear on it.  We therefore remanded for the District Court to make the

---

[1] Consistent with the appellants' opening briefs and our practice regarding "Spanish naming customs," we refer to the appellants as "Quiñones," "Rosario," and "Millán," respectively. United States v. Rosa-Borges, 101 F.4th 66, 68 n.1 (1st Cir. 2024); see Caz v. Garland, 84 F.4th 22, 25 n.1 (1st Cir. 2023).

appropriate findings, while retaining jurisdiction over the appeals brought by Quiñones, Rosario, and Millán.

The District Court has now made the relevant findings and concluded, based on them, that the statements at issue were properly admitted into evidence. The parties have provided supplemental briefing addressing those findings, and we have carefully reviewed the parties' filings and the record. Our review leads us to reject the challenges Quiñones, Rosario, and Millán bring to their convictions based on the statements that each contends were improperly admitted into evidence. That review also leads us to reject Millán's challenge to his convictions based on cumulative error. We therefore affirm these three defendants' convictions.

## I.

The convictions stem from a federal criminal investigation into the activities of La Asociación Ñeta ("La Ñeta"), an organization originally founded by prisoners to advocate for their rights throughout Puerto Rico's prisons. Based on that investigation, the U.S. government brought criminal charges against fifty defendants in the District of Puerto Rico. Quiñones, Rosario, and Millán were among them, and each of these defendants was charged with two criminal counts.

The first count was for RICO conspiracy under 18 U.S.C. § 1962(d) for conspiring to violate 18 U.S.C. § 1962(c), which

- 4 -

makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." "[R]acketeering activity" includes, as relevant here, "dealing in a controlled substance," id. § 1961(1), and a "pattern of racketeering activity" is defined as "at least two acts of racketeering," id. § 1961(5), that are "related, occur within ten years of one another, and pose a threat of continued criminal activity," United States v. Millán-Machuca, 991 F.3d 7, 18 (1st Cir. 2021).

The indictment alleged that the RICO enterprise was La Ñeta. It alleged that entity had "evolved . . . [into] a criminal organization" "whose members and associates engaged in drug distribution and acts of violence, including murder." It further alleged that Quiñones, Rosario, and Millán conspired to participate directly or indirectly to facilitate La Ñeta's pattern of racketeering activity involving drug trafficking in cocaine, heroin, and marijuana.

The other count was for conspiracy to violate 21 U.S.C. § 841(a)(1), which makes it "unlawful for any person knowingly or intentionally" "to manufacture, distribute, or dispense . . . a controlled substance." Id.; see id. § 846 (criminalizing conspiracy to violate § 841). The indictment alleged that

- 5 -

Quiñones, Rosario, and Millán each had conspired to "knowingly and intentionally possess with intent to distribute" more than one "kilogram of a mixture or substance" containing heroin, more than five "kilograms of a mixture or substance containing" cocaine, and more than one hundred "kilograms of a mixture or substance containing" marijuana.

After being jointly tried before a jury, Quiñones, Rosario, and Millán were each convicted on both counts. They then appealed, and we consolidated their appeals with the appeals that three of their codefendants -- Luis Daniel Ramos-Baez, Juan J. Claudio-Morales, and José Rafael Sanchez-Laureano -- had brought to their convictions for the same two offenses. See United States v. Ramos-Baez, 86 F.4th 28, 45-46 (1st Cir. 2023).

In our earlier opinion addressing these consolidated appeals, we rejected the challenges brought by Ramos, Claudio, and Sanchez to their convictions. We concluded, however, that we could not resolve the challenges that Quiñones, Rosario, and Millán brought based on certain statements that the government contended were admissible at their trial pursuant to United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), but for which key findings had not been made.

That case holds that, pursuant to Federal Rule of Evidence 801(d)(2)(E), a statement that would otherwise be inadmissible as hearsay is admissible if the district court finds

that the party seeking its admission has shown by a preponderance of the evidence that a coconspirator made the statement "during and in furtherance of the conspiracy." Petrozziello, 548 F.2d at 22 (quoting Fed. R. Evid. 801(d)(2)(E)). Proof of the declarant's membership in the conspiracy must be corroborated by "extrinsic evidence beyond the statement itself." Ramos-Baez, 86 F.4th at 72. "The rationale" underlying this exception is that, because "conspirators are partners in crime," they are "deem[ed] . . . agents of one another." Anderson v. United States, 417 U.S. 211, 218 n.6 (1974). "And just as the declarations of an agent bind the principal only when the agent acts within the scope of his authority, so the declaration of a conspirator must be made in furtherance of the conspiracy charged in order to be admissible against his partner." Id.

We explained that the District Court had not made findings as to whether the alleged hearsay statements were in fact made by a coconspirator during and in furtherance of the conspiracy. We further concluded that we could not deem that failure harmless because it was "not apparent" on the record before us "whether the preponderance standard ha[d] been met" as to the statements that Quiñones, Rosario, and Millán challenged under Petrozziello. (Quoting United States v. Machor, 879 F.2d 945, 951 (1st Cir. 1989).)

Accordingly, we remanded the three defendants' cases for the District Court to make Petrozziello findings, while retaining jurisdiction over their consolidated appeals. We also dismissed without prejudice Millán's appeal insofar as it challenged his convictions on the ground that the aggregate effect of errors at his trial required vacating his conviction.[2] We did so because we concluded that a finding of Petrozziello error might support Millán's cumulative error claim.

On remand, the District Court ordered Quiñones, Rosario, and Millán to identify the statements for which Petrozziello findings needed to be made. They collectively identified dozens of such statements. The government, due to what it described as "a calendar oversight," did not file a response. The District Court then held a hearing and "f[ound] by a preponderance of the evidence that with respect to the three defendants, the declarants and the three defendants were members of the same conspiracy at the time the statements were made," "the statements were made in furtherance of the conspiracy," and "there was ample extrinsic evidence beyond the statement[s themselves] of the defendants' involvement in the conspiracy."

_____

[2] Quiñones also brought a cumulative error challenge, which we rejected on the ground that "no error" had been found in the "various [other] rulings" Quiñones challenged, leaving us with "no cumulative effect to consider." (Quoting United States v. Pérez-Montañez, 202 F.3d 434, 440-41 (1st Cir. 2000).)

- 8 -

After the District Court's ruling on remand, we sought supplemental briefing from the parties. The bulk of the statements that Quiñones, Rosario, and Millán identify in their supplemental briefing as having been admitted into evidence in violation of Petrozziello were recounted in testimony at their trial by three La Ñeta members, each of whom had pleaded guilty to the charged RICO conspiracy. Those individuals are José González-Gerena, Alex Miguel Cruz-Santos, and Orlando Ruiz-Acevedo.

Some of the other challenged statements were recounted in the testimony that another La Ñeta member, Miguel Álvarez-Medina, gave. He was not charged, however, in the conspiracy, and he denied having ever participated in La Ñeta's illicit activities, such as drug trafficking. The remaining statements that we must address were entered into evidence through transcripts and recordings of intercepted phone calls.

## II.

The government contends that, in our prior opinion, we "circumscribed" our review under Petrozziello to encompass only those statements to which Quiñones, Rosario, and Millán contemporaneously objected on Petrozziello grounds at their trial. The government therefore argues that we must reject the vast majority of the challenges under Petrozziello that Quiñones, Rosario, and Millán advance in their supplemental briefing on the

ground that none of these three defendants lodged any such objection to the statements that underlie those challenges.

The government also argues that Quiñones, Rosario, and Millán have waived their challenges to their convictions that rest on any statements that were not specifically advanced in their opening briefs in these appeals. So, the government contends, for that reason, too, we must reject many of the challenges that Quiñones, Rosario, and Millán now advance in their supplemental briefs because, in their opening briefs to us, these three defendants did not identify many of the statements that they now contend were wrongly admitted under Petrozziello.

We need not address these threshold grounds for rejecting the Petrozziello challenges before us, however, if those challenges otherwise have no merit. Thus, we bypass the parties' dispute about those threshold grounds because, for the reasons we will explain, we conclude that their challenges to their convictions under Petrozziello are unavailing once we account for the deference that we owe the District Court's Petrozziello findings and the substantial amount of unchallenged inculpatory evidence that the record contains. See United States v. Ciresi, 697 F.3d 19, 26 (1st Cir. 2012) (noting that clear error review applies to preserved Petrozziello challenges).

We emphasize upfront that the District Court did not offer a statement-by-statement assessment under Petrozziello in

rejecting the challenges that Quiñones, Rosario, and Millán bring to their convictions under that precedent. Instead, the District Court made a determination -- quoted above -- that none of the challenges under Petrozziello had merit, given what the record showed about the statements in question.

Quiñones, Rosario, and Millán make no argument to us that the District Court, in so concluding, failed to make Petrozziello findings as to any statements that they identified on remand as being in need of such findings. They thus treat the District Court as having made findings as to each of those statements and simply challenge those findings on the ground that the record does not suffice to support them. And, in pressing their contentions that those findings do not hold up on this record, they proceed by advancing statement-specific arguments in their supplemental briefs.

In the analysis that follows, we directly address each of those statement-specific challenges. In doing so, we do not understand Quiñones, Rosario, or Millán to dispute that, if a review of the record provides support for the District Court's finding that each statement was made by a coconspirator during and in furtherance of the conspiracy, then the District Court did not err in admitting that statement under Petrozziello.

Moreover, we note that we may affirm the district court on any ground manifest in the record. Segrain v. Duffy, 118 F.4th

45, 58 (1st Cir. 2024). Thus, to the extent the record makes clear that any error under Petrozziello with respect to a specific challenged statement would be harmless, we may reject the Petrozziello-based challenge to that statement on that ground alone. See United States v. Piper, 298 F.3d 47, 56-58 (1st Cir. 2002). And further, whenever there is some other basis manifest in the record for rejecting a challenge to a statement that is independent of the District Court's ground for doing so, we may reject the challenge to that statement on that independent ground as well. See, e.g., United States v. Barone, 114 F.3d 1284, 1296 (1st Cir. 1997) ("[W]e may affirm the district court's evidentiary rulings on any ground apparent from the record on appeal.").

## III.

We begin with Quiñones's Petrozziello challenges. They concern statements that three distinct declarants made and that were recounted in testimony that Ruiz and Cruz gave.

## A.

Quiñones first takes aim at statements Ruiz recounted that had been made by a La Ñeta member known as "Jowy" about "differences and problems" between Jowy and Quiñones due to the latter's failure to pass along certain drug "incentives" to La Ñeta. The "incentives" were payments owed to La Ñeta in exchange for that organization giving individual La Ñeta members permission to sell drugs on their own behalf.

Quiñones contends that these statements are not admissible under Petrozziello because they merely described drug dealing that advanced Quiñones's personal interests. As a result, he contends they were not statements that a coconspirator made in furtherance of a conspiracy involving him and Jowy.[3]

The record supportably shows, however, that González (one of the cooperating witnesses for the government who pleaded guilty to the charged conspiracy) separately testified that he had personally "work[ed] . . . drugs with Jowy" on behalf of La Ñeta. And the challenged statement by Jowy, on its face, conveyed information regarding "differences and problems" between him and Quiñones due to Quiñones's supposed failure to comply with La Ñeta's requirements for paying drug "incentives" to that organization. Thus, the District Court did not clearly err in admitting this statement into evidence as a statement that a coconspirator made during and in furtherance of the conspiracy to facilitate La Ñeta's racketeering activities. See United States v. Pérez-Vásquez, 6 F.4th 180, 195 (1st Cir. 2021) (concluding statements were in furtherance of the conspiracy when made by one conspirator to keep another "abreast of current developments and

_____

[3] Quiñones does not challenge the timing of the statements by arguing that they were not made "during" the charged conspiracy. In any event, the record shows that the statements were made within the timeframe charged in the indictment.

- 13 -

problems facing the group" (quoting United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005))).

**B.**

Quiñones also challenges statements, recounted in Cruz's testimony, that older La Ñeta members made to new inmates to teach them about the structure and history of the organization. Quiñones refers to the individuals who made these statements as the "Elders." This challenge also fails.

Quiñones argues that Petrozziello bars these statements because the Elders were not members of the charged conspiracy and that, in any event, the statements were not made during and in furtherance of that conspiracy. That is so, he contends, in part because the statements were made outside the timeframe of the conspiracy alleged in the indictment in which Quiñones was alleged to have been a participant.

The government responds that the record supportably shows that the Elders "were La Ñeta members" and thus, for that reason alone, participants in the charged conspiracy. It goes on to contend that the statements were made in furtherance of that conspiracy because they provided new La Ñeta members with information necessary to "continu[ing] on in the operation of the association," although the government does not address when the statements were made.

Even if the District Court erred under Petrozziello in admitting these statements, the error was harmless. In arguing otherwise, Quiñones contends only that the government failed to offer any independent "proof of the 'structure' of the [RICO] 'enterprise,'" thereby rendering the statements in question especially damaging to his case. (Citing Boyle v. United States, 556 U.S. 938, 945 (2009).) But the record shows that these statements were "cumulative of" a wealth of other evidence, United States v. Valdivia, 680 F.3d 33, 46 (1st Cir. 2012), as various witnesses testified from personal experience regarding meetings related to La Ñeta's illicit activities, the organization's hierarchical structure, and its practice of punishing members who did not follow the organization's "norms and rules." Thus, we reject this challenge on harmless error grounds. See United States v. Rodríguez-Torres, 939 F.3d 16, 25 (1st Cir. 2019) (concluding that the evidence "far surpasse[d] what Boyle requires for a RICO enterprise" where an organization had "meetings[] and rules," "a loose hierarchical structure," and a "business-like" practice of "reward[ing] good performance and loyalty").

## C.

Quiñones's remaining Petrozziello-based challenge concerns testimony that Cruz gave about an alleged drug transaction between Quiñones and Millán. Quiñones argues that this testimony must have been based on statements of an unnamed third-party

- 15 -

declarant, given that Cruz was in a different prison than Quiñones at the time that the alleged transaction took place. Quiñones then contends that there is no basis for finding that these statements were admissible under Petrozziello as coconspirator statements made in furtherance of the conspiracy. (In making this challenge, Quiñones does not raise any timing-based concern about the statements.)

Quiñones did not challenge these statements in his opening brief to our Court. He also did not identify them in his motion responding to the District Court's order on remand to "identify those statements requiring . . . consideration under [Petrozziello]." As a result, insofar as the challenge is not waived by virtue of having been first raised only in his supplemental briefing, our review is only for plain error. See United States v. Ortiz, 966 F.2d 707, 715 (1st Cir. 1992). But because Quiñones's opening and supplemental briefs on appeal "fail[ed] to even mention plain error" with respect to the statements he now challenges, "let alone argue for its application here," he has waived on appeal any argument for meeting that demanding standard.[4] United States v. Benjamin-Hernandez, 49 F.4th 580, 585 (1st Cir. 2022).

---

[4] Because we assume error with respect to only one of the statements that Quiñones challenges, we are again left with "no cumulative effect to consider." United States v. Ramos-Baez, 86 F.4th 28, 75 n.9 (1st Cir. 2023) (quoting Pérez-Montañez, 202 F.3d

We now take up Rosario's <u>Petrozziello</u> challenges, which concern the District Court's decision to allow statements that Ruiz and Álvarez recounted in their testimony to be admitted into evidence.  The declarants are "Boringo," Dianis Negrón, and "Quintana."

Rosario argues that there is no evidence that establishes that any of these declarants were participants in "any conspiracy" with him.  He further argues that the record provides no basis for finding that the statements were made during and in furtherance of any conspiracy because it is "unknown" under what circumstances or "for what purposes" the statements were made.  Accordingly, he contends that the District Court clearly erred in admitting this testimony under <u>Petrozziello</u>.  We are not persuaded that the District Court committed reversible error.

**A.**

We start with the challenge to Boringo's statement about Rosario's alleged involvement in drug trafficking.  Ruiz recounted that statement while testifying that Boringo gave Ruiz drugs to sell on behalf of La Ñeta and that Boringo would sometimes tell

---

at 441).  Accordingly, we reject Quiñones's revived cumulative error challenge.

him, "[L]ook, these drugs are good.  I gave some to [Rosario].  I gave some to Tito, I gave some to different jails."

Rosario argues that there is "no evidence" that Boringo was a member of "any conspiracy" in which Rosario participated. Ruiz testified, however, that he personally sold drugs for Boringo after the date on which the charged conspiracy began, and that Boringo paid La Ñeta in connection with those drug sales.  That testimony constitutes evidence extrinsic to the challenged statement by Boringo about his involvement in the conspiracy with which Rosario was charged with being a participant -- namely, the conspiracy to facilitate La Ñeta's racketeering activities.

Moreover, the record shows that Ruiz testified that Boringo made that statement to him while they were engaged in their drug trafficking activities.  The record thus supportably shows that the statement was made for the purpose of Boringo "vouching" -- to use the government's description -- for the quality of the drugs.  Accordingly, the District Court did not clearly err in finding that a coconspirator made the statement in furtherance of the conspiracy in question.  Cf. United States v. Colón-Díaz, 521 F.3d 29, 37 (1st Cir. 2008) (statements that a particular individual's drugs "were 'the best' sought directly to promote the conspiracy's goal" of selling drugs by "engender[ing] confidence" in the buyer regarding their quality).

- 18 -

**B.**

We also reject Rosario's challenge to Ruiz's testimony that, even before Ruiz personally met Rosario, he "knew of" him from "talk[ing] . . . about" him with Dianis Negrón. Rosario argues that this testimony was attributable to statements that Negrón made to Ruiz and that it was clear error to find that, despite having been based on statements made by a third-party declarant, the testimony was admissible under Petrozziello. The government responds that this testimony "is neither hearsay nor based on hearsay," as "Ruiz simply stated he talked about Rosario with Negrón."

Even assuming that this testimony is hearsay or based on hearsay, we conclude that any error in admitting it into evidence was harmless. Rosario argues otherwise on the ground that Ruiz's testimony regarding Rosario "would have been eliminated entirely" if the challenged portions of it had to be excluded as hearsay.

As we have already explained, however, the District Court did not clearly err in permitting Ruiz to testify regarding the statement made to him by Boringo concerning Rosario's involvement in drug trafficking. Moreover, the record shows that when Ruiz was asked at trial whether he "kn[e]w of" Rosario prior to meeting him, Ruiz responded that he "knew of him . . . [t]hrough different people," including not only by talking about him with Negrón but also through Boringo and another La Ñeta member known

as "Tito Grande."  So, any error in admitting the challenged statements in the Ruiz testimony that Rosario attributes to Negrón fails on harmless error grounds because Rosario does not challenge the materially similar statements by Boringo and Tito Grande introduced in that testimony.  See Valdivia, 680 F.3d at 46.

## C.

Rosario's third and final Petrozziello-based challenge concerns a statement about his alleged participation in drug trafficking.  Álvarez recounted the statement in question while testifying that Quintana told him that Rosario supplied him (Quintana) with drugs.

The government argues that the District Court properly admitted this statement under Petrozziello.  It also points out in doing so that Álvarez testified that both Quintana and another La Ñeta member known as "Chuito Carolina" told him about Rosario's involvement in drug trafficking.[5]

That last point is significant. Rosario does not dispute that the statement by Chuito was admissible, even though it is

---

[5] Specifically, when Álvarez was asked whether Rosario "was . . . involved in drug trafficking" in his role "as the number two leader" of a particular prison, Álvarez responded, "Yes."  When asked how he knew that, Álvarez responded, "He was the supplier of two friends of mine, Omar Quintana Moss, a/k/a Omar El Gordo. Jesus Delgado Ortiz, a/k/a Chuito Carolina.  Both are [La Ñeta] members. . . . [H]e would supply substances for them to sell . . . ."

- 20 -

"cumulative of" the challenged statement by Quintana. Valdivia, 680 F.3d at 46. He also does not challenge González's testimony that Rosario told him on more than one occasion that he (Rosario) had "fund" drugs -- that is, drugs that are sold by La Ñeta members on La Ñeta's behalf. In addition, as we have just explained, the District Court did not clearly err in admitting into evidence Boringo's statement that he and Rosario were involved in trafficking drugs together. Thus, any error in admitting the Quintana statement was harmless. See id. (deeming harmless admission of "purported hearsay testimony . . . cumulative of other evidence in the record"); see also United States v. Veloz, 948 F.3d 418, 434 (1st Cir. 2020) (deeming admission of purported hearsay harmless where another coconspirator "had already appeared at trial and testified to the same effect").

## V.

We come, then, to Millán's Petrozziello challenges. In all, they concern more than a dozen statements. Some were recounted in testimony by González, Cruz, and Álvarez. The rest were recounted in recordings of intercepted phone calls that the government introduced into evidence. We see no basis for overturning Millán's convictions based on these challenges.

## A.

Notably, the government argued at trial that Millán was La Ñeta's "maximum leader" -- its highest-ranking individual -- for

years.  Also of note, Millán does not dispute that he served in La Ñeta leadership.  He argues only that the challenged statements were improperly admitted under Petrozziello and highly prejudicial.  That is so, he contends, because the other evidence at most "showed . . . Millán's efforts to maintain [La] Ñeta's original prisoner advocacy mission" and to further its "legitimate aims."  That other evidence, as he sees it, did not show his agreement to participate in a pattern of drug trafficking on behalf of the organization or to facilitate its racketeering activities.  He also contends that these statements painted a false picture of the control that he exercised over La Ñeta's membership or drug proceeds.

It is important to emphasize at the outset that there is significant inculpatory evidence against Millán that he does not challenge under Petrozziello.  Indeed, as we will explain, the government introduced unchallenged evidence that, in his role as maximum leader, he required that monthly reports be made regarding the status of each prison's drug trafficking and incentive-related finances, and he called meetings, requested reports, and issued directives regarding La Ñeta's membership and disciplinary issues.  Other witness testimony that Millán does not challenge under Petrozziello establishes that Millán worked directly with several

La Ñeta members, including Cruz and Ruiz, to traffic drugs and manage drug-related finances.[6]

There is a case to be made, based on this unchallenged inculpatory evidence, that each of Millán's Petrozziello challenges fails on harmless error grounds alone. Nonetheless, Millán also brings a cumulative error challenge. We therefore think it prudent to address each of the statements that he challenges under Petrozziello so that we may properly address that challenge. After all, even though we reject many of Millán's individual Petrozziello challenges on harmless error grounds, he premises his claim of cumulative error on the asserted aggregate effect of errors that he contends is greater than the effect of any one of the asserted errors on its own. See United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993) (explaining that multiple errors may "in the aggregate have a more debilitating effect" on the fairness of trial proceedings than the errors considered in isolation). Thus, to properly evaluate that contention, it is important to ensure that we have a firm grasp on the universe of challenged statements, if any, that may have been

---

[6] As we explain below, we previously rejected Millán's challenges to Cruz and Ruiz's testimony under the Jencks Act, 18 U.S.C. § 3500; Brady v. Maryland, 373 U.S. 83 (1963); and Giglio v. United States, 405 U.S. 150 (1972).

admitted into evidence in violation of Petrozziello. Hence, the need for the statement-by-statement analysis that follows.

**B.**

We start with Millán's challenge to Jowy's statement that Millán sent drugs to him to sell on behalf of La Ñeta. González recounted the statement while testifying that, when he was "working the drug tables" with Jowy, Jowy told him, "[W]e have to tally up this for [Millán], 200. There can't be any credit on this. This has to be a ticket over another ticket."

Millán argues that the District Court clearly erred in finding this statement admissible under Petrozziello because "the record lacks extrinsic evidence establishing that Jowy and [Millán] were [coconspirators]" and does not "demonstrate" that the statement was made in furtherance of the conspiracy.[7] As we explained above, however, González's firsthand testimony about "working the drug tables" with Jowy is record evidence, extrinsic to the challenged statement, of Jowy's membership in the conspiracy in which Millán was charged with being a participant. In addition, given the context that González's testimony provides, the statement Millán challenges about what Jowy said about him to González is fairly understood to have been intended to communicate

---

[7] Millán makes no argument disputing that the statement in question was made during the charged conspiracy.

- 24 -

information to González regarding La Ñeta's priorities for processing the drugs in question. Thus, there was no clear error under Petrozziello in admitting this statement into evidence as a statement of a coconspirator made during and in furtherance of the conspiracy. See United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir. 2002) (concluding that statements were made in furtherance where they "conveyed to other [coconspirators] information about the operations of the drug conspiracy").

C.

We next consider Millán's challenge to the statement that Millán appointed Claudio, one of Millán's codefendants, to collect phone "incentives" -- that is, payments that members of La Ñeta made to the organization for the privilege of using certain contraband cell phones. González recounted this statement when he testified that an individual known as "Sandwich" told him that Millán assigned Claudio "to deal with the cell phone incentives" because he was "upset" with him.[8]

Millán argues that the record lacks extrinsic evidence either that the declarant -- whom Millán does not identify -- conspired with Millán or that the declarant made the

---

[8] Millán does not argue that this particular statement was hearsay-within-hearsay.

statements in furtherance of a conspiracy.[9]  The District Court did not clearly err in finding that this statement satisfied Petrozziello.

Contrary to Millán's assertion, the record provides extrinsic evidence of Sandwich's membership in the conspiracy in which Millán was charged with being a participant.  Specifically, one witness testified that Sandwich threatened to kill another La Ñeta member for being a "snitch."  See United States v. Rodríguez, 162 F.3d 135, 143 (1st Cir. 1998) (concluding that a defendant's "violence against a suspected informant [wa]s relevant to prove his membership in the conspiracy").  In addition, the statement may supportably be found to have involved one coconspirator (Sandwich) communicating information to another coconspirator (González) regarding the dynamics between, and allocation of duties among, the members of the enterprise -- La Ñeta -- whose racketeering activities they were conspiring to facilitate.  After all, as noted above, González pleaded guilty to the charged RICO conspiracy offense.  Thus, we see no basis for finding clear error under Petrozziello as to this statement.  See Martinez-Medina, 279 F.3d at 117; see also Sepulveda, 15 F.3d at 1181 (concluding statements were in furtherance of the conspiracy where they

---

[9] Millán again makes no argument that this statement was not made during the charged conspiracy.

identified a member's "role and activities"); Flemmi, 402 F.3d at 95 (finding statement in furtherance of the conspiracy where it kept coconspirators informed of "problems facing the group" (quoting United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000))).

**D.**

There also is no merit to Millán's challenge under Petrozziello to Cruz's testimony that he knew that Millán and Quiñones trafficked drugs together because Cruz had once acted as a conduit to pass heroin from Millán to Quiñones. Millán argues that this testimony was "based entirely on [Quiñones's] statements to [Cruz], not on [Cruz's] personal knowledge." He argues that Cruz "provided no direct evidence of . . . Millán's involvement" in the drug sales in question, such as "personal observation" or "direct contact," and that it was error to find that the statement was nonetheless admissible under Petrozziello.

The record shows, however, that, in response to the government's questions regarding how Cruz knew that Millán and Quiñones trafficked drugs together, Cruz repeatedly answered that he knew because he participated in a drug transaction with them. There is no suggestion in his testimony that he learned that information from Quiñones. To the contrary, Cruz said he "worked with" Millán on that transaction to get the drugs to Quiñones. We therefore agree with the government that this testimony "was based

on Cruz's personal experience as a middleman between Millán and Quiñones" and so contains "no hearsay statement." See United States v. Avilés-Colón, 536 F.3d 1, 14-15 (1st Cir. 2008). As a result, here, too, the District Court did not err in admitting this statement. See Barone, 114 F.3d at 1296.

**E.**

There similarly is no merit to Millán's challenge to statements that Cruz recounted pertaining to, in Millán's words, the "structure, norms, and activities across [La] Ñeta institutions." (Citation modified.) The statements relate to La Ñeta's leadership structure and the basic contours of its drug operations and unlawful activities. Millán argues that "[t]he declarants making these assertions were neither identified nor shown to be conspirators with . . . Millán," and that the statements "were not shown to further the conspiracy." But Millán does not challenge ample other inculpatory evidence under Petrozziello, including an intercepted phone call introduced at trial in which Millán himself hinted at La Ñeta's organizational hierarchy and the division of labor between its various members. As a result, any error under Petrozziello as to these statements was harmless. See Valdivia, 680 F.3d at 46.

**F.**

We next take up Millán's challenge to statements by Joseph de Leon and Benji Loiza about Millán's alleged personal

involvement in drug trafficking. Álvarez recounted these statements in his testimony.[10]

It is important to remember in assessing this challenge that the government did not need to prove that Millán was personally involved in the sale of drugs to convict him of either conspiracy offense at issue. See Ramos-Baez, 86 F.4th at 60; id. at 53 (stating that the government was only required to show that "each defendant knew about and agreed to facilitate the conspiracy to conduct [La Ñeta's] affairs through the commission of at least two acts of racketeering" (citation modified)). The reason that fact matters is that there was ample evidence in the record that Millán has not challenged under Petrozziello that shows that he agreed to facilitate La Ñeta's drug trafficking activities.

For example, Ruiz testified that Millán had not only given him drugs to sell, but that Millán would also alert him when the money from drug sales had been received. In addition, the record contains evidence of an intercepted call in which Millán is discussing drug finances and issues related to drug debts owed by La Ñeta members. In that same call, Millán appears to endorse a

---

[10] Millán also challenges Álvarez's testimony that he learned of Millán's position as maximum leader through an organization chart. To the extent that this statement prejudiced Millán by identifying him as La Ñeta's maximum leader, we find any error in the admission of this statement harmless, as Millán was repeatedly identified as La Ñeta's maximum leader at trial.

"plan" requiring that each prison give La Ñeta leadership monthly reports on its drug funds and incentives. Thus, any error under Petrozziello in admitting these statements into evidence was harmless.

**G.**

We also must reject Millán's challenge to Cruz's testimony that (1) chapter leaders -- that is, La Ñeta leaders of individual prisons -- were required to report to Millán regarding drug trafficking activities; (2) Millán chose all chapter leaders; and (3) Millán's drugs were "constantly" sold "mostly" in the prison in which Millán was incarcerated. As Millán sees it, this testimony could not have been based on Cruz's personal knowledge, because it relates to events that either occurred in a different prison from the one in which Cruz was located or for which he had not been personally present. He thus contends that it was error to admit the testimony under Petrozziello.

We are not persuaded by Millán's contention that Cruz could not have testified about Millán appointing chapter leaders and the reports those leaders made to Millán "[w]ithout relying on hearsay." When questioned at trial about how he knew that information, Cruz responded, "Because [Millán] put me in [a] position of leadership, and also because of the things that you learn along the way." Millán contends that the latter statement shows that Cruz's testimony was based at least in part on

information he had "learn[ed] along the way" from others. But that statement appears to regard reports that were made to La Ñeta leadership -- reports which Cruz went on to explain he had personally made to Millán. Thus, to the extent Millán challenges testimony that was based on Cruz's personal knowledge rather than hearsay, it fails at the threshold. See Barone, 114 F.3d at 1296. And to the extent Cruz's testimony was based in part on hearsay, any error in its admission was harmless, given that other admissible evidence was "cumulative of" the same. Valdivia, 680 F.3d at 46.

We also must reject the challenge to Cruz's testimony that Millán's drugs were "constantly" sold "mostly" in a prison in which Cruz was not housed. Independent of that testimony from Cruz, the above-mentioned statements by Millán during the intercepted call strongly support a finding that Millán "knew about and agreed to facilitate" La Ñeta's drug transactions, particularly in light of other testimony by Cruz and Ruiz regarding their personal experiences working with Millán to traffic drugs. Ramos-Baez, 86 F.4th at 53 (quoting United States v. Leoner-Aguirre, 939 F.3d 310, 316 (1st Cir. 2019)). So, any error on this score was also harmless. See Valdivia, 680 F.3d at 46.

**H.**

We next consider Millán's challenge under Petrozziello to Cruz's testimony that Millán appointed Claudio and Quiñones to

La Ñeta leadership roles. Millán contends that Cruz based his testimony on hearsay statements that others made to him. He argues that is so because Cruz "inferred" that Millán made the appointments in question "because others told [him] 'that's how it works.'" From that premise, Millán goes on to argue that these statements are not admissible under Petrozziello because the declarants who told Cruz about the appointments "are unidentified and not shown to be in . . . a conspiracy with . . . Millán," no extrinsic evidence of a conspiracy is identified, and the statements are not "shown to be in furtherance of the conspiracy."

It is hardly evident that Cruz did not rely on his personal knowledge to make the statements in question. Cruz did not say in his testimony that he knew that "that's how [appointments have] always worked" because others had told him so. The record also shows that Cruz himself had been appointed to a La Ñeta leadership position.

In any event, any error in admitting this testimony was harmless. There was substantial other evidence about appointments, including the statement attributable to Sandwich that we described above about Millán appointing Claudio to collect cell phone incentives.

**I.**

Millán separately takes aim at González's testimony that Millán had "knowledge of everything," which Millán contends was

based on hearsay statements of an unknown declarant. But there was ample other evidence supporting the same proposition. Below, we affirm the District Court's decision to admit into evidence a very similar statement by Rolando Millán-Machuca -- Millán's brother -- regarding the need to provide Millán with "proof of everything." And testimony by another witness and statements on intercepted phone calls additionally support that such reports were made to Millán. So, any error here was harmless as well.

## J.

Millán's final challenge concerns a slew of statements that were recounted in the recordings and transcripts of intercepted telephone calls that the government introduced into evidence. The challenged statements are: (1) a statement by a La Ñeta member known as "Omi" regarding Millán putting another La Ñeta member "in his place" for failing to fully remit an incentive; (2) statements by "several declarants" describing reports made to Millán regarding the murder of an inmate and the conduct of certain La Ñeta members; (3) a statement by a La Ñeta member known as "Bambani" regarding Millán having told another La Ñeta member to "do whatever you have to do" to "deal with" certain La Ñeta leadership issues; (4) a statement by Jowy that Millán had "closed the doors" -- that is, halted the sale of particular drugs within a prison; (5) statements made by Jowy, recounting a conversation with Millán, regarding a dispute over incentive payments and

stating that Millán "sent [someone] out to collect some money"; (6) statements by Rolando Millán-Machuca that Millán must have "proof of everything"; and, finally, (7) statements by several declarants regarding Millán's reactions to reports given to him, as well as a hearsay-within-hearsay statement of a caller who allegedly said she had "something" to "give" to Millán. Millán argues that there is no extrinsic evidence in the record showing either that Millán conspired with the declarants in the phone calls or that the statements were made in furtherance of a conspiracy.[11]

**1.**

There is no merit to Millán's challenge to the first statement, which Omi made to a group of individuals that included Sandwich.[12] Extrinsic evidence supportably shows that Omi was a member of the charged conspiracy, as nonhearsay evidence establishes that he smuggled cell phones into prison on behalf of La Ñeta.[13] The evidence also supports a finding that the statement

---

[11] As to the final set of statements, Millán additionally argues that the evidence fails to show that they were made "at the time" that the declarant may have been conspiring with Millán. Insofar as Millán by this means to argue that the statement was not made during the timeframe of the charged conspiracy, we reject that argument, as the record clearly shows otherwise.

[12] We above concluded that there is sufficient evidence in the record to support the District Court's finding that Sandwich was a member of the charged conspiracy.

[13] This evidence came in through a statement by Sandwich -- who, as we explained above and in the previous footnote, the record supportably showed to be a coconspirator -- to another La Ñeta member in the same call regarding the facilitation

was made in furtherance of that conspiracy by keeping coconspirators "abreast of current developments," Flemmi, 402 F.3d at 95 (quoting Jefferson, 215 F.3d at 824), and encouraging "loyalty" from conspirators, United States v. Laureano-Pérez, 797 F.3d 45, 66 (1st Cir. 2015).

**2.**

We also reject Millán's challenge to statements in which several declarants -- including two individuals known as "La Cana" and "Mickey Motors" -- discussed violations of La Ñeta's drug trafficking rules and issues La Ñeta was facing following the murder of an inmate. Other record evidence supportably shows that La Cana and Mickey Motors were members of the conspiracy.[14] And, in context, these statements fairly can be understood to have relayed updates on "the activities of the conspiracy's members," Avilés-Colón, 536 F.3d at 15, and issues and "problems facing the

---

of communication between La Ñeta members concerning its racketeering activities. See United States v. Mitchell, 596 F.3d 18, 24 (1st Cir. 2010) (pointing to admissible statements in "recordings of phone calls" as extrinsic evidence of membership in conspiracy); United States v. Ruiz, 999 F.3d 742, 749 (1st Cir. 2021) (concluding that out-of-court statements that qualify as nonhearsay under the federal rules constitute "extrinsic evidence" under Petrozziello).

[14] As to La Cana, one witness separately testified that she funneled drugs into prisons on behalf of La Ñeta. And as to Mickey Motors, Cruz testified that Mickey Motors was working to "clear up" La Ñeta's name after an inmate had been murdered in order to ensure that "everything they were working on was [not] going to be in [vain]."

group," Pérez-Vásquez, 6 F.4th at 195 (quoting Flemmi, 402 F.3d at 95). They also encouraged ongoing compliance with La Ñeta's rules. See Laureano-Pérez, 797 F.3d at 66; Ciresi, 697 F.3d at 30 (statements intended to "forestall any dissension" were in furtherance of the conspiracy).

A handful of statements in the intercepted call were made by an unidentified declarant. Any error in the admission of those statements was harmless, as they were entirely "cumulative of" the statements made by La Cana and Mickey Motors in the same call. Valdivia, 680 F.3d at 46.

### 3.

We similarly must reject Millán's challenge to both the third statement identified above, which was made by Bambani, and the fourth statement identified above -- that Millán had "closed the doors" -- which was made by Jowy. As the government contends, Millán failed to preserve challenges to these statements because he failed to include them in the list of statements for which Petrozziello findings needed to be made that he provided to the District Court on remand. As a result, these challenges are at least forfeited and so reviewable only for plain error. See United States v. Pena, 24 F.4th 46, 60-61 (1st Cir. 2022). The government contends that any such challenges must be rejected, because Millán "fail[ed] to argue the plain error standard in [his] briefing to this Court" and so thereby has waived his challenges to unpreserved

statements.  (Citing, inter alia, United States v. Morales-Vélez, 100 F.4th 334, 345 (1st Cir. 2024).)

Millán counters that his supplemental brief incorporated the plain error arguments made in his opening brief to our Court and that the government is therefore wrong to say that he "failed" to advance those arguments.  We disagree.

In his opening brief, Millán argued that the District Court's failure to conduct a Petrozziello analysis constituted plain error.  Now that the District Court has made such a finding, Millán needs to develop an argument as to why any error in making that finding with respect to the statements here is plain.  As he has not done so, he has "ma[de] no attempt to satisfy" the plain error standard.  United States v. Rodriguez-Monserrate, 22 F.4th 35, 40 (1st Cir. 2021).  It follows that he has waived these challenges.

**4.**

We reject, too, Millán's challenge to the District Court's Petrozziello ruling as to the fifth set of challenged statements, which Jowy made about disputes over incentive payments and Jowy's statement that Millán "sent" someone "to collect some money."  As we explained above, the record supportably shows that Jowy was a participant in the charged conspiracy.  The statements also fairly can be understood to have been made in furtherance of that conspiracy because they kept other members of the conspiracy

(Sandwich and Rolando Millán-Machuca) informed of "current developments and problems facing the group." Pérez-Vásquez, 6 F.4th at 195 (quoting Flemmi, 402 F.3d at 95).

**5.**

That brings us to Millán's sixth challenge to statements in the intercepted calls. Here, he focuses on statements that Rolando Millán-Machuca made about Millán's need to receive "proof of everything." The District Court did not clearly err in finding those statements admissible under Petrozziello.

The record contains extrinsic evidence of Rolando Millán-Machuca's membership in the charged conspiracy.[15] It also supportably shows that the statements were made in furtherance of the conspiracy. In that regard, the record supportably shows that they were made in the context of Rolando Millán-Machuca urging other coconspirators, including Jowy, to provide Millán with evidence that yet another coconspirator had violated the group's drug trafficking rules and failed to remit incentive payments he had collected on behalf of La Ñeta. See Laureano-Pérez, 797 F.3d at 66 (statements in furtherance of conspiracy where they encouraged compliance with group's rules).

---

[15] That evidence included González's testimony that González committed a murder-for-hire on direction from Rolando Millán-Machuca in the latter's role as a La Ñeta leader, as well as a statement, recounted in testimony by González and attributed to Millán, acknowledging the same.

**6.**

Finally, Millán challenges statements by several declarants about Millán's reactions to reports allegedly made to him and a statement by a La Ñeta member known as "Moncho" regarding La Cana saying she had "something" to "give" to Millán. Even if it were clear error to admit these statements under Petrozziello, the challenges that Millán makes to his convictions based on them fail because he does not explain how these particular statements prejudiced him.

If Millán means to suggest that the statements prejudiced him by tending to show that he was receiving reports and engaging in leadership conduct related to La Ñeta's drug sales, we cannot agree. Ample other evidence showed the same. Similarly, insofar as La Cana's statement that she had "something" to "give" to Millán supported an inference that Millán was trafficking drugs, other witnesses, including Cruz and Ruiz, permissibly testified about Millán's participation in drug trafficking.

Moreover, as we have explained, the government did not need to prove that Millán personally trafficked drugs in order to convict him of the conspiracy offenses at issue. And ample independent evidence supportably showed that he agreed to participate in that conspiracy. We thus conclude that any error in admitting this somewhat cryptic statement into evidence was harmless.

To this point, we have addressed all the Petrozziello-based challenges that Quiñones, Rosario, and Millán bring to their convictions. Our work is not yet done, though, because we still must address Millán's separate challenge to his convictions on cumulative error grounds.

We have not concluded in our analysis thus far that the District Court erred in admitting any of the statements that Millán challenges under Petrozziello. We sometimes bypass the question of whether the District Court did so, however, by relying solely on harmless error to explain why, with respect to a specific challenge, there was no basis for vacating any of the convictions. The question therefore arises whether, to properly address Millán's claim of cumulative error, we must determine if there were any errors in admitting the statements underlying those challenges.

As we will explain, we conclude that we need not do so. Even if we were to assume as to each of those specific challenges that the District Court erred under Petrozziello in admitting the relevant statement into evidence as a coconspirator statement made during and in furtherance of the conspiracy, there still would be no merit to the claim of cumulative error due to the strength of

the other properly admitted (or unchallenged) evidence against Millán.[16]

The statements for which we bypassed the question of Petrozziello error -- and thus the statements that we may assume were admitted into evidence in violation of that precedent -- include: (1) those recounted by Cruz regarding La Ñeta's structure and history; (2) those by de Leon and Loiza regarding Millán's alleged personal involvement in drug trafficking; (3) those introduced in testimony by Cruz regarding the sale of Millán's drugs and Millán's control over and appointment of La Ñeta leaders; (4) González's testimony that Millán has "knowledge of everything"; and (5) those recorded in an

---

[16] In our earlier opinion rejecting Millán's challenges (save for those based on Petrozziello), we resolved two of his disclosure-based challenges, which related to Ruiz and Cruz, under Giglio, 405 U.S. 150. We did so on the ground that no prejudice had been shown. Importantly, to make out a claim under Giglio, the defendant must show not only that the government failed to disclose certain information pre-trial, but also that the failure to disclose was material in that it prejudiced the defendant. See id. at 154; Ramos-Baez, 86 F.4th at 57. Thus, our no-prejudice-based rulings amounted to a conclusion that there was no Giglio violation, rather than a conclusion that there was a violation but that any error was harmless. And, although we left open the possibility that we might reconsider Millán's disclosure-based challenges in light of any Petrozziello errors that we might identify following the proceedings on remand, we now close it, as Millán has not shown that any potential Petrozziello errors should cause us to revisit our prior conclusions rejecting the Giglio-based challenges we disposed of on no-prejudice grounds. We therefore need not consider his disclosure-based challenges in assessing his claim of cumulative error.

intercepted phone call regarding Millán's reactions to reports given to him, and another individual's statement that she had "something" to "give" to Millán. As to these statements, we must ask whether, assuming it was error to admit them into evidence, the cumulative effect of those errors sufficiently calls into question the verdicts such that we must vacate the convictions when we consider them in light of the other evidence in the record as a whole. See Sepulveda, 15 F.3d at 1195-96. We conclude that, given the otherwise "overwhelming" evidence, United States v. Castellini, 392 F.3d 35, 52 (1st Cir. 2004), that Millán "knew about and agreed to facilitate the conspiracy to conduct [La Ñeta's] affairs through the commission of at least two acts of racketeering," Ramos-Baez, 86 F.4th at 53 (citation modified), these statements (even if erroneously admitted under Petrozziello) do not create the kind of prejudice that would warrant overturning the convictions.[17]

---

[17] As to Cruz, Millán argues that he identified the speakers on the intercepted phone calls and that the statements those speakers made were "central to the government's case." We previously concluded, however, that Millán had failed to explain how a late disclosure prejudiced him in seeking to exclude those calls. Because Millán does not assert that any Petrozziello-based errors would lead us to conclude otherwise, he has given us no reason to revisit that conclusion. Similarly, Millán does not argue that admission of any of the statements he now challenges renders the inconsistencies in Ruiz's testimony regarding drug quantities and Ruiz's prison disciplinary history, which we previously found insufficiently prejudicial, more harmful. We therefore decline to disturb our prior ruling on that issue as well. We note, finally, that Millán does argue that, if the

First, as to the activities of La Ñeta, the record contains unchallenged testimony from González -- an alleged coconspirator who pleaded guilty to the RICO conspiracy -- regarding numerous acts of racketeering that he personally witnessed or conducted on La Ñeta's behalf. Those acts included drug sales, which González testified occurred "[e]very day," and a murder he personally committed under direction of La Ñeta leadership. González also testified, unchallenged, regarding La Ñeta's leadership structure, its drug trafficking processes, the quantities of drugs that La Ñeta moved through numerous prisons each month, and La Ñeta's processes for sanctioning members who failed to abide by its rules.

Second, as to Millán specifically, González testified without challenge from Millán that González personally "work[ed] the drug tables" with Jowy every day for at least two weeks to process drugs which Jowy told him -- in a statement we already deemed admissible above -- had been sent by Millán. González further testified -- without challenge from Millán -- that he had personally spoken with Millán multiple times, both by phone and face-to-face, including regarding drugs that were being sold on

challenged statements were omitted, Ruiz's testimony would become "the primary evidence" against Millán. For reasons we will explain, we disagree, as we conclude that, even without Ruiz's testimony, there is overwhelming evidence of Millán's agreement to participate in the alleged conspiracies.

- 43 -

Millán's behalf and which González wanted permission to obtain, as well as regarding the murder González had committed on direction of another La Ñeta leader.

Third, Millán does not challenge González's testimony that, in response to concerns that González communicated to Millán regarding potential consequences González might face due to his participation in that murder, Millán told González, "[F]orget about that. That was an Order from Rolando. Rolando can give it, because he's one of the first three positions within the maximum leadership." And González testified, also unchallenged, that Millán told him that he could tell anyone who "cause[d] an uproar about [the murder] . . . to call [Millán]." This testimony alone provides powerful evidence of Millán's knowing agreement to facilitate the conspiracy, including his control over drug sales conducted on his behalf and smoothing over member relations following the commission of illicit acts. See United States v. Acevedo-Hernández, 898 F.3d 150, 162 (1st Cir. 2018) ("A defendant's knowing and voluntary participation can be proven through circumstantial evidence, including inferences from acts committed by the defendant that furthered the conspiracy's purposes." (citation modified)); United States v. Rodríguez-Reyes, 714 F.3d 1, 8 (1st Cir. 2013) (concluding that defendants' behavior "band[ing] together to protect their group's status and exclusivity" supported finding an agreement to conspire); United

States v. Negrón-Sostre, 790 F.3d 295, 312 (1st Cir. 2015) (concluding that individuals' "regular, ongoing presence and interaction with each other is certainly strong circumstantial evidence that they associated themselves with the venture").[18]

Finally, the intercepted phone calls recount unchallenged statements regarding Millán's control over the sanctions that were imposed on members who owed drug debts to La Ñeta or who broke La Ñeta's rules. Those statements include one in which Millán himself said he had "personally sent word" to a La Ñeta member to warn him that he would be punished unless he paid his debts. There are also numerous admissible coconspirator statements in intercepted calls that show that La Ñeta members discussed drug finances and membership issues with Millán, and two coconspirators made statements in those calls regarding Millán's involvement in drug operations and the collection of drug finances. Indeed, in a lengthy intercepted call recording a La Ñeta leadership meeting that Millán does not challenge, Millán repeatedly demonstrated an expectation that La Ñeta members would report to him and defer to his leadership, and he also made several comments referencing La Ñeta's drug economy.

---

[18] The testimony against Millán is even stronger when we take into consideration testimony by Ruiz and Cruz, who -- as noted above -- each testified that they had worked directly with Millán to traffic drugs.

Given this substantial body of evidence showing that Millán "knew about and agreed to facilitate the conspiracy to conduct [La Ñeta's] affairs through the commission of at least two acts of racketeering," Ramos-Baez, 86 F.4th at 53 (citation modified), "[o]n this record, we cannot conclude that there is a reasonable probability that exclusion of [the statements at issue] would have altered the outcome of the trial," United States v. Manon, 608 F.3d 126, 139 (1st Cir. 2010). Accordingly, Millán's cumulative error challenge fails.

## VII.

For the foregoing reasons, we **affirm** the appellants' convictions.